Commonwealth *v.* Nelson, Appellant.

Argued May 27, 1953. Before STERN, C. J., STEARNE, JONES, BELL and CHIDSEY, JJ.

reargument refused April 27, 1954.

*Victor Rabinowitz,* of the New York Bar, with him *Hymen Schlesinger* and *Louis F. McCabe,* for appellant.

*William F. Cercone,* Assistant District Attorney, with him *James F. Malone, Jr.,* District Attorney, for appellee.

*William Allen Rahill* and *Julian E. Goldberg;* and *Newell G. Alford, Jr., Herbert Monte Levy* and *Arthur Garfield Hays,* of the New York Bar; filed a brief for the American Civil Liberties Union et al., amici curiae.

OPINION BY MR. JUSTICE JONES, January 25, 1954:

The appellant Nelson was convicted in the Court of Oyer and Terminer of Allegheny County on all twelve counts of an indictment charging him, inter alia, with an attempt to overthrow the government of the United States by force and violence contrary to the Pennsylvania Sedition Act of 1919, re-enacted as a part of

Pennsylvania's Criminal Code of 1939: see Section 207 of the Act of June 24, 1939, P.L. 872, 18 PS §4207. The prosecution's evidence consisted in large part of proof of the defendant's membership and official position in the Communist Party, his attendance at Party meetings and the introduction of a mass of documentary evidence consisting of books, papers and pamphlets advocating, teaching or promulgating Communist doctrine, found in the Party headquarters and bookstore in Pittsburgh of which the defendant was a supervising principal. The defendant's motions for a new trial and in arrest of judgment were denied by the court en banc in an opinion written by the trial judge. Nelson was thereupon sentenced to pay a fine of $10,000, the costs of prosecution (amounting in taxable items to $13,000) and to undergo imprisonment for a term of 20 years. On appeal from the judgment of sentence, the Superior Court affirmed *per curiam:* see 172 Pa. Superior Ct. 125, 151, 92 A. 2d 431. Upon petition of the defendant, we allowed an appeal as our statute required us to do because of the constitutional questions involved: see Act of Assembly of June 24, 1895, P. L. 212, Sec. 7 (e), 17 PS §190; also, *Commonwealth v. Gardner,* 297 Pa. 498, 499, 147 A. 527, and *Commonwealth v. Caulfield,* 211 Pa. 644, 61 A. 243.

In support of his motion for a new trial, the appellant, in addition to his contentions on constitutional grounds,[1] cites numerous instances of alleged trial error which raise serious questions as to whether his conviction resulted from a fair and impartial trial,—

---

[1] Among the constitutional questions which the appellant raises is his assignment of the trial court's submission to the jury of the four counts of the indictment based upon the allegedly unconstitutional subdivision (c) of the Act which defines "sedition" as "Any writing, publication, printing, cut, cartoon, utterance, or conduct, either individually or in connection or combination with any other person, the intent of which is: . . . (c) To incite or encourage

one devoid of bias and prejudice. As the defendant has, at all times, admitted his membership and position in the Communist Party, obviously his views are so extremely unpopular with a vastly preponderant majority of the citizenry of our Country as to amount virtually to an anathema in the public mind. That very circumstance makes it especially incumbent upon a court, in reviewing the conviction of such a person for an alleged offense against the body politic, to scrutinize the record with utmost care to see that he received a trial that fully comports with our concept of tradition-

_____

any person to commit any overt act with a view to bringing the Government of this State or of the United States into hatred or contempt": 18 PS §4207. The court en banc approved the trial judge's charge to the jury in this connection and rejected the attack on the constitutionality of subdivision (c) on the ground that both this court and the Superior Court had upheld the Act as valid. Such, however, is plainly not so. In *Commonwealth v. Widovich,* 295 Pa. 311, 316, 145 A. 295, where the constitutionality of the State Sedition Act of 1919 was dealt with, this court expressly excluded subdivision (c) from consideration, saying,—"Our immediate discussion will deal with all the foregoing paragraphs [(a) to (h) incl.], with the exception of paragraph (c); no charge was laid thereunder, and it will not be considered." Likewise, in each of the Superior Court cases cited by the court below, subdivision (c) was notably not involved: see *Commonwealth v. Lazar,* 103 Pa. Superior Ct. 417, 419-420, 157 A. 701, and *Commonwealth v. Blankenstein,* 81 Pa. Superior Ct. 340, 346. At the earlier trial of Nelson's co-indictees (Onda and Dolsen) under separate indictments identical with the one here involved (all three indictments having been returned by the same grand jury simultaneously), the judge who presided at that trial withdrew from the jury's consideration the four counts based on subdivision (c), holding that provision to be unconstitutional. This constitutional question has never been passed upon by either of our appellate courts. See *State v. Klapprott,* 127 N. J. L. 395, 22 A. 2d 877, where "hatred", inter alia, as a condemned product of inciting speech was held to be constitutionally too vague and indefinite to support a penal sanction; and *Winters v. New York,* 333 U. S. 507, 516-517, where *State v. Klapprott,* supra, was cited and quoted with approval.

al due process—quite apart from any question of trial error in the admission or rejection of evidence or in alleged excesses or deficiencies in the court's instructions to the jury.

Thus, the appellant charges that he was refused a reasonable postponement of the trial, which he sought in order to pursue his effort to obtain counsel, and was thereby denied due process of law, citing *Powell v. Alabama,* 287 U.S. 45; that the trial judge, who was an incorporator, officer and member of the executive committee of a local nonprofit corporation, known as "Americans Battling Communism", which had publicly demanded the defendant's indictment, deprived him of due process by refusing to disqualify himself, citing *Tumey v. Ohio,* 273 U.S. 510, 534, and *Snyder's Case,* 301 Pa. 276, 290, 152 A. 33; that the prosecutor in the information upon which the indictment was founded and chief witness against the defendant at the trial was a member of the same court in which the indictment was returned and the trial had; and that the district attorney indulged in improper, prejudicial and inflammatory remarks throughout the trial and, particularly, in his address to the jury. These and other matters of fundamental importance to a question of due process, if true, appear to have sufficient factual basis in the record to require that they be pondered conscientiously and well before being passed over as unsubstantial.

But, with any or all of that, we need not now be concerned. The appellant's principal and cogent contention is that the Pennsylvania Sedition Act was suspended by operation of law upon the enactment by Congress of Title I of the Act of June 28, 1940, c. 439, 54 Stat. 670, known as the Smith Act [2] which defines

---

[2] Revised June 25, 1948, c. 645, 62 Stat. 808, 18 U.S.C. §§2384-2385,. as part of the revision and codification of Title 18 of the United States Code, entitled "Crimes and Criminal Procedures".

sedition against the United States and prescribes punishments therefor. If the Pennsylvania Act was so superseded, then the defendant's conviction cannot be sustained. Accordingly, we are met at the outset with this question which was pressed timely in the trial court, was urged upon the Superior Court on appeal and has been stressed before us. In our opinion, the contention is well founded. Consequently, the motion in arrest of judgment should have been granted and the indictment quashed.

~ The question is obviously one of greatest importance. It not only revolves about a serious offense allegedly committed against the Government of the United States but it also calls for a consideration and understanding of the relationship between the Federal Government and the several States and the limitations upon the actions of each in respect of the other. As the question is basic to the appeal, our plain and immediate duty, therefore, is to decide it in accordance with what we take to be the applicable and controlling principles of law as declared by the Supreme Court of the United States. Article VI of the Federal Constitution provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

Under our federal system, as is generally known, there are functions of government which a State may not exercise because such matters have been committed, either expressly or impliedly, by the Constitution of the United States to the care of the Federal Government: see *Tennessee v. Davis*, 100 U.S. 257, 266. A State may not, for instance, set up its own postal

system, coin money, impose duties on imports or exports, declare war, make treaties or do a number of things which are exclusively within the federal province. There are, however, other matters with respect to which both the Federal Government and a State may concurrently legislate. But, even there, if the inference is reasonably deducible that it was the purpose of Congress by its enactment to pre-empt the particular field, State legislation on the same subject is automatically suspended. This is so regardless of the validity in general of the state statute which is simply superseded and, thus, rendered inefficacious so long as the federal statute endures.

The criteria for determining the congressional purpose in such connection may be evidenced in several ways as was indicated by the Supreme Court in *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230, where it was said that "The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. *Pennsylvania R. Co. v. Public Service Comm'n*, 250 U.S. 566, 569; *Cloverleaf Butter Co. v. Patterson*, 315 U.S. 148. Or the Act of Congress may touch a field in which the federal interest is so dominent that the federal system will be assumed to preclude enforcement of state laws on the same subject. *Hines v. Davidowitz*, 312 U.S. 52. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. *Southern R. Co. v. Railroad Commission*, 236 U.S. 439; *Charleston & W. C. R. Co. v. Varnville Co.*, 237 U.S. 597; *New York Central R. Co. v. Winfield*, 244 U.S. 147; *Napier v. Atlantic Coast Line R. Co.*, supra. Or the state policy may produce a result inconsistent with the objective of the federal statute. *Hill v. Florida*, 325 U.S. 538."

As was also recognized in the *Rice* case, supra,—"It is often a perplexing question whether Congress has precluded state action or by the choice of selective regulatory measures has left the police power of the States undisturbed except as the state and federal regulations collide." But, the congressional purpose to pre-empt a particular field is not made to depend upon a positively expressed legislative intent to that end. Such purpose can as readily be evidenced objectively by what the circumstances reasonably indicate as being necessary for the complete and unhampered effectuation of the federal aims and objectives. "For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and *that which needs must be implied is of no less force than that which is expressed": Savage v. Jones,* 225 U.S. 501, 533 (Emphasis supplied). So readily does the inference of federal pre-emption arise, when the National Government and a State enter the same field of legislative activity, that concurrent power to enforce the Eighteenth Amendment to the Federal Constitution was expressly included therein in order that it be not inferred that the power of the Federal Government in such regard was exclusive even though "each State possessed that power in full measure prior to the Amendment" and the Federal Government did not. Such was the observation made by Mr. Chief Justice Taft in speaking for the Supreme Court in *United States v. Lanza,* 260 U.S. 377, 381, when he said,—". . . the probable purpose of declaring a concurrent power to be in the States was to negative any possible inference that in vesting the National Government with the power of country-wide prohibition, state power would be excluded."

In *Hines v. Davidowitz,* 312 U. S. 52, the Supreme Court held Pennsylvania's Alien Registration Act of June 21, 1939, P. L. 652, 35 PS §1801 et seq., to have

been suspended by Title III of the Act of Congress of June 28, 1940, c. 439, 54 Stat. 670, 673, cited as the "Alien Registration Act, 1940" although the federal statute contained no express declaration of congressional intent to supersede. (Incidentally, the Act of June 28, 1940, supra, whose Title III thus operated to suspend the Pennsylvania Alien Registration Act of 1939, is the same Act whose Title I, i.e., the Smith Act, is here involved as to its effect upon the Pennsylvania Sedition Act of 1939.) The grounds upon which the Supreme Court based its conclusion of federal preemption in the *Hines* case were (1) that the state legislation relating to local registration of nationals of foreign governments might involve international relations which, from the first, have called for broad national authority and (2) that such legislation dealt "with the rights, liberties, and personal freedoms of human beings",—a field wherein the protection of such rights against unlawful invasion by a State depends ultimately upon the guarantees of the Fourteenth Amendment of the Federal Constitution. What *Hines v. Davidowitz* decided, as later appraised by the Supreme Court itself in *Rice v. Santa Fe Elevator Corp.,* supra, was that "the [Alien Registration] Act of Congress . . . touch[ed] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."

On the basis of the Supreme Court decisions, the following propositions may, we believe, be reasonably postulated,—(1) federal legislation can and sometimes does supersede state legislation even though cognate congressional intent has not been expressly declared; and (2) in the course of years there has grown up from many federal decisions on the subject of congressional statutory supersession of state legislation categories of situations in which such super-

session occurs. The answer, then, to the question of suspension of state legislation in a case such as the present depends upon whether the facts of the case fit the specifications of any of such categories.

One of the categories of supersession is when the field, in which both the Federal Government and the State have legislated, is of paramount importance to the Federal Government. What federal interest, it may be asked, could be more dominant than maintenance of the security of the Federal Government itself which the Smith Act was designed to vouchsafe against subversive political assaults? And what could be more hampering to the exercise of federal power in such connection than to have a State assume to prosecute what is in truth an affront to the National Government? We have already referred to the powers of the Federal Government derived through state concession, either expressly or impliedly, upon the adoption of the Constitution. But, wholly apart from that, the Federal Government has at all times possessed the *inherent* right to protect and defend itself against enemies domestic as well as foreign. The old saying that "Self preservation is the first law of nature" is as true of nations as it is of animal life. When, therefore, a State assumes to punish, as does the Pennsylvania statute here involved, sedition against the United States, it is intruding in a matter where the national interest is obviously paramount. It follows necessarily that the Federal Government's control of the field must be exclusive if it is to protect itself effectively and completely. And that means no sharing of the jurisdiction with the States.

The arrest of suspects by a State for indictment and trial on charges of sedition against the United States under a local statute could readily impair and even thwart the Federal Government's contemporaneous investigation of the alleged offenders. Indictees

under the Pennsylvania statute, for example, might well be but a part of a larger group spread over a number of States. The appropriate place for the indictment and trial of all such is best determined and selected by the Federal Government, alone, with its national jurisdiction and policies. And, Congress, in enacting the Smith Act, must have so recognized.

A state's jurisdiction of crime can extend only to acts committed within its borders. And, while the Pennsylvania statute proscribes sedition against either the Government of the United State or the Government of Pennsylvania, it is only alleged sedition against the United States with which the instant case is concerned. Out of all the voluminous testimony, we have not found, nor has anyone pointed to, a single word indicating a seditious act or even utterance directed against the Government of Pennsylvania. Indeed, it is difficult to conceive of an act of sedition against a State in our federated system that is not at once an act of sedition against the Government of the United States,—the Union of the forty-eight component States. Conversely, the duty of suppressing sedition within a State rests directly upon the Federal Government by virtue of Article IV, Section 4, of the Constitution which charges the National Government with the duty of guaranteeing "to every State in this Union a Republican Form of Government." This positive constitutional mandate Congress undertook to carry out in the original Smith Act (54 Stat. 671) by expressly making it a crime for anyone to advocate, etc. the overthrow or destruction by force or violence of "*any* government in the United States" (Emphasis supplied). The same interdiction was expressed in the 1948 revision of the Smith Act (62 Stat. 808) as being applicable to the attempted overthrow or destruction of "the government of the United States or the government of any State, Territory, District or Pos-

session thereof, or the government of any political subdivision therein . . . ." Federal pre-emption could hardly be more clearly indicated.

Nor is a State stripped of its means of self-defense by the suspension of its sedition statute through the entry of the Federal Government upon the field. There are many valid laws on Pennsylvania's statute books adequate for coping effectively with actual or threatened internal civil disturbances. As to the nationwide threat to all citizens, imbedded in the type of conduct interdicted by a sedition act, we are—all of us—protected by the Smith Act and in a manner more efficient and more consistent with the service of our national welfare in all respects.

The difference in the penalties respectively prescribed by the Smith Act and the Pennsylvania Sedition Act strongly argues that it was not the congressional purpose that, after enactment of the Smith Act, conflicting or disparate state statutes on the same subject should be called into play for the punishment of sedition against the United States. Under the Smith Act, as revised in 1948, the maximum sentences prescribed are six years and ten years depending upon the particular section of the Act under which conviction is had, i.e., Sec. 2384 or Sec. 2385 of Title 18 U.S.C. In the case now under review, Nelson received a sentence under the Pennsylvania statute of twenty years for his conviction of sedition against the United States. Such a disparity in the sentences prescribed for the same offense, if multiplied by further like instances from other States, could not help but confuse and hinder the attack on sedition which calls for uniform action on a national basis. Uniformity in the range of sentences imposable throughout the country for sedition against the Government of the United States is assured only by the exclusive use of the federal statute.

If conviction under the state's statute for sedition against the Government of the United States were permitted to be operative in the face of the Smith Act, then double punishment for the same offense would be possible. Indeed, on the Commonwealth's theory, if each of the other forty-seven States had a Sedition Act like Pennsylvania's, one chargeable with sedition against the government of the United States could be indicted, convicted and punished in any or all of such States as were able to obtain service of their criminal process upon him, as well as by the Federal Government. In the present instance, after the appellant's conviction and sentence in the State Court, he, along with others, was indicted in the District Court of the United States for the Western District of Pennsylvania under the conspiracy section of the Federal Criminal Code[3] for conspiring to violate the Smith Act. All have since been tried and convicted, Nelson receiving a sentence of five years. The acts proven in the Federal Court to effectuate the alleged conspiracy consisted of practically the same matter as was offered against Nelson in the trial in the State Court. And, so, Nelson's offense has been independently passed upon by a Federal Court where it properly belongs. If the state conviction were to be upheld, the result would be that both the Federal Government and the State would punish the appellant for substantially the same alleged offense *against the United States.*

The court below cited *United States v. Lanza,* supra, which was concerned with the question of concurrent jurisdiction to enforce prohibition. That case obviously affords no support for the proposition that the Federal Government and the States have concurrent jurisdiction to punish sedition against the United States. The Eighteenth Amendment expressly pro-

---

[3] Act of June 25, 1948, c. 645, 62 Stat. 683, 701, 18 U.S.C. §371.

vided that "The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation." We have already seen the reason for that precautionary reservation to the States. *Westfall v. United States*, 274 U.S. 256, also cited by the court below, is wholly irrelevant. The manager of a state-bank member of the Federal Reserve was held to be criminally liable under both the Federal Reserve Act and the state law for his misapplication of the bank's funds. That was not a matter of the State punishing for a federal offense. The State's part was taking cognizance of and denouncing the separate affront to its own peace and dignity in the purely local offense of embezzlement while the Federal Government's concern was the vindication of the banking law to which the state bank was subject. Nor is *Fox v. Ohio*, 46 U.S. 410, authority for concurrent federal and state jurisdiction of the same offense. In that case there were two separate offenses, one federal and the other state. The *counterfeiting* was a crime against and constitutionally punishable solely by the Federal Government while the "imposture of passing a false coin" was "a private wrong" and a "cheat" punishable by the State.

*Gilbert v. Minnesota*, 254 U.S. 325 (1920), affords no basis for concluding that the Smith Act did not operate to suspend Pennsylvania's Sedition Statute. In the *Gilbert* case a state statute made it unlawful " 'to interfere with or discourage the enlistment of men in the military or naval forces of the United States or of the State of Minnesota.' " The view of counsel for the State, which the Supreme Court adopted, was that " 'The act . . . [did] not relate to the raising of armies for the national defense, nor to rules or regulations for the government of those under arms [a constitutionally exclusive federal power]. It [was] simply a local police measure, aimed to suppress a species of

seditious speech which the legislature of the State ha[d] found objectionable.' " As the Supreme Court further observed,—". . . the State knew the conditions which existed and could have a solicitude for the public peace, and this record justifies it. Gilbert's [anticonscription] remarks were made in a public meeting. They were resented by his auditors. There were protesting interruptions, also accusations and threats against him, disorder and intimations of violence. And such is not an uncommon experience. On such occasions feeling usually runs high and is impetuous; there is a prompting to violence and when violence is once yielded to, before it can be quelled, tragedies may be enacted. To preclude such result or a danger of it is a proper exercise of the power of the State." The irrelevancy of *Gilbert v. Minnesota* to a question such as is here presented was directly declared in *Hines v. Davidowitz,* supra, where the State's attorney general cited and relied upon the *Gilbert* case on the question of the suspension of Pennsylvania's Alien Registration Statute by the federal Alien Registration Act. In answer, the Supreme Court said (p. 67, fn. 18) that the *Gilbert* case was not "relevant to the issues here presented." On the basis of the foregoing, it seems clear that a State's exertion of its conceded power to punish a breach of the peace, as in the *Gilbert* case, does not carry with it the right to "conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations": *Hines v. Davidowitz,* supra.

No question of federal supersession of a state statute was in issue in *Dennis et al. v. United States,* 341 U.S. 494, and, indeed, none could have been. The *Dennis* case was concerned exclusively with prosecutions under the Smith Act. No state statute was in any way involved. Nor was such question in issue when the Supreme Court upheld the validity of the

state statutes in *Gitlow v. New York,* 268 U.S. 652 (1925), and *Whitney v. California,* 274 U.S. 357 (1927). When the *Gitlow* and *Whitney* cases were before the Supreme Court, there was no federal statute proscribing sedition. The Sedition Act of 1918, contained in the Second Espionage Act (40 Stat. 553), had been repealed by Congress in 1921 (41 Stat. 1359, 1360) and it was not until the enactment of the Smith Act in 1940 that sedition was again made a federal crime. It is obvious, therefore, that a question of congressional supersession of a state statute in respect of the proscription of sedition against the United States could not have been raised between 1921 and 1940 and, naturally, none was raised or considered in either the *Gitlow* or the *Whitney* case. And, the same is equally true of *Commonwealth v. Widovich,* 295 Pa. 311, 145 A. 295 (1929), where appeals were dismissed and certiorari denied by the Supreme Court, sub nom., *Muselin v. Pennsylvania,* 280 U.S. 518 (1929); *Commonwealth v. Lazar,* 103 Pa. Superior Ct. 417, 157 A. 701, allocatur refused, 103 Pa. Superior Ct. xxv (1931), appeal dismissed, 286 U.S. 532 (1932); and *Commonwealth v. Blankenstein,* 81 Pa. Superior Ct. 340 (1923). The reason given by the Supreme Court for the dismissal of the appeals in the *Widovich* and *Lazar* cases was want of a substantial federal question. Certain it is that no question of federal supersession of the Pennsylvania Sedition Statute was or even could have been raised in those cases.

Unlike the Smith Act, which can be administered only by federal officers acting in their official capacities, indictment for sedition under the Pennsylvania statute can be initiated upon an information made by a private individual. The opportunity thus present for the indulgence of personal spite and hatred or for furthering some selfish advantage or ambition need only be mentioned to be appreciated. Defense of the

Nation by law, no less than by arms, should be a public and not a private undertaking. It is important that punitive sanctions for sedition *against the United States* be such as have been promulgated by the central governmental authority and administered under the supervision and review of that authority's judiciary. If that be done, sedition will be detected and punished, no less, wherever it may be found, and the right of the individual to speak freely and without fear, even in criticism of the government, will at the same time be protected.

The pre-eminence of the National Government's interest in defending itself efficiently and effectively against sedition seems so evident as not to admit of any reasonable dispute. In enacting the Smith Act, Congress must have understood, and therefore have intended, that the federal legislation would supersede a state statute on the same subject. It will be recalled that in *Hines v. Davidowitz* one of the reasons for the supersession of the Pennsylvania Alien Registration Act by Title I of the Act of Congress of 1940 was that the state legislation affected "the rights, liberties, and personal freedoms of human beings . . . ." Double and possibly multiple trials and punishments for the same offense would hardly do less. In *De Jonge v. Oregon,* 299 U.S. 353, 365, Mr. Chief Justice Hughes, speaking for a unanimous Court, wisely counselled that "The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of con-

stitutional government." Surely, no more impressive admonition could have been given to the judiciary of our Country. If this counsel is to be heeded faithfully, it is essential that criminal sanctions for conduct hostile to our Federal Government be promulgated, imposed and controlled uniformly for the Nation as a whole. And that, only the central Government can accomplish.

The judgment is reversed and the indictment quashed.

Mr. Justice MUSMANNO and Mr. Justice ARNOLD took no part in the consideration or decision of this case.

CONCURRING OPINION BY MR. CHIEF JUSTICE HORACE STERN, MR. JUSTICE ALLEN M. STEARNE AND MR. JUSTICE CHIDSEY:

We concur in the foregoing opinion in its entirety.

Sedition against the United States is not a *local* offense. It is a crime against the *Nation*. As such, it should be prosecuted and punished in the Federal courts where this defendant has in fact been prosecuted and convicted and is now under sentence. It is not only important but vital that such prosecutions should be exclusively within the control of the Federal Government, and we are of opinion that this is required in order to harmonize the respective constitutional powers of the Nation and the several States. We assume that the question involved, being obviously one of national importance, will be finally determined by the Supreme Court of the United States.

———

DISSENTING OPINION BY MR. JUSTICE BELL:

Congress has *never* once said that Pennsylvania's law or any State law on Sedition was superseded or invalidated; the Supreme Court of the United States

has *never* said so; if there could be any doubt on the question—and in my opinion there is none—it should certainly not be resolved in favor of freeing one of the top leaders of the Communist Party in America, who has just been convicted of plotting the destruction of our Country.

Sedition has been a crime under the law of Pennsylvania since 1861. The defendant was indicted, tried and convicted under the Pennsylvania Sedition Act of 1939 (P.L. 872, 18 PS 4207—which reenacted the Sedition Act of June 26, 1919, P.L. 639). The Sedition Act makes it a felony "(a) To make or cause to be made any outbreak . . . of violence against this State or against the United States. (b) To encourage any person . . . to engage in any conduct with the view of overthrowing or destroying . . . by any force or show or threat of force, *the Government of this State or of the United States.*"*

The analogous decisions of the Supreme Court of the United States, the preservation of the police power of every Sovereign State in the United States, and —most important of all—the protection, safety and security of our Country imperatively require that the Pennsylvania Sedition Act be sustained.

The majority base their Opinion upon two grounds —(1) Supersession, and (2) Double Jeopardy. They are both equally and clearly untenable.

I. *Supersession.*

The Tenth Amendment to the Constitution of the United States provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Federalist (No. XXXII) in speaking of the delegation of State power to the Federal Government, said (page 143) : ". . . This exclusive

---

* Italics throughout, ours.

delegation, or rather this alienation of state sovereignty, would only exist in three cases: where the constitution in express terms granted an exclusive authority to the union; where it granted, in one instance, an authority to the union, and in another, prohibited the states from exercising the like authority; and where it granted an authority to the union, to which a similar authority in the states would be *absolutely and totally contradictory and repugnant. . . ."*

The majority opinion admits, as it must, that the Constitution does not grant exclusive authority to the Federal Government; it admits, as it must, that the Constitution does not expressly or even impliedly prohibit the States from legislating on the subject of Sedition; it merely claims that because Congress has recently legislated on the subject it thereby preempted the entire field of Sedition. This, as we shall see, is a non sequitur. Moreover, the Pennsylvania Sedition Act and the Smith Act are obviously complementary and not by the wildest stretch of the imagination can they be said to be contradictory or repugnant or conflicting.

The constitutionality of Pennsylvania's Sedition Act was sustained in *Commonwealth v. Lazar,* 103 Pa. Superior Ct. 417, 157 A. 701, appeal dismissed 286 U.S. 532, and in *Commonwealth v. Blankenstein,* 81 Pa. Superior Ct. 340; *Commonwealth v. Widovich,* 295 Pa. 311, 145 A. 295. In the latter case, several members of the Communist Party were indicted and convicted under a prior Sedition Act which was reenacted in 1939. This Court, after holding that the Sedition Act does not violate freedom of speech or any provision of the Federal Constitution, said (page 317) : ". . . The legislature, under the police power, to preserve the State's republican form of government, to suppress insurrection and to maintain the safety, peace and order of its citizens, may enact laws

to suppress acts or attempts to commit acts of violence toward the government; it may prohibit the teaching or advocacy of a revolution or force as a means of redressing supposed injuries, or effecting a change in government. See Buffalo Branch, Mutual Film Corp. v. Breitinger, 250 Pa. 225; White's App., 287 Pa. 259, and cases there referred to. It is true that section 7 is a part of the Bill of Rights, but overshadowing these rights is the authority of the government to preserve its existence under the police power. Article XVI of the Constitution says *'the police power shall never be abridged.'* This relates to all phases of its exercise. *The police power is the greatest and most powerful attribute of government; on it the very existence of the state depends*: 6 R.C.L. 183; District of Columbia v. Brooke, 214 U.S. 138; Bank v. Haskell, 219 U.S. 104; Eubank v. Richmond, 226 U.S. 137."

In *Wortex Mills v. Textile Workers U. of A.,* 369 Pa. 359, 85 A. 2d 851, we said: ". . . It is well to recall that a State or other Sovereign has a paramount right and an inescapable duty to maintain law and order, to protect life, liberty and property and to enact laws and police regulations for the protection and preservation of the safety, health and welfare of the people of the state or community: Carnegie-Illinois Steel Corp. v. U.S.W. of A., 353 Pa. 420, 426, 45 A. 2d 857; Westinghouse Electric Corp. v. United Electrical Workers, 353 Pa. 446, 460, 46 A. 2d 16.

" 'The power and duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, and the property of its residents cannot be doubted': Thornhill v. Alabama, 310 U.S. 88, 105; Carlson v. California, 310 U.S. 106, 113. The sovereign powers of a State should be protected and sustained except where restricted by the Federal or State Constitution and except where 'an "intention of Congress to exclude States from exerting their police

power [is] clearly manifested.". . .': Allen-Bradley Local v. Wisconsin E.R. Board, 315 U.S. 740, 749."

In the *Allen-Bradley Local* case, supra, Mr. Justice DOUGLAS, speaking for a unanimous Court, said (page 749) : ". . . this Court has long insisted that an *'intention of Congress to exclude States from exerting their police power must be clearly manifested.'* Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 611, and cases cited; Kelly v. Washington, 302 U.S. 1, 10; South Carolina Highway Dept. v. Barnwell Bros., 303 U.S. 177; H.P. Welch Co. v. New Hampshire, 306 U.S. 79, 85; Maurer v. Hamilton, 309 U.S. 598, 614; Watson v. Buck, supra."

In *Auto Workers v. Wisconsin Employment Relations Board,* 336 U.S. 245, 253, Mr. Justice JACKSON, in sustaining an injunction against a union by a State Court of Wisconsin in matters affecting interstate commerce, said: ". . . the *'intention of Congress to exclude States from exercising their police power must be clearly manifested.'* "

In *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, the Court said (page 230) : "Congress legislated here in a field which the States have traditionally occupied. See Munn v. Illinois, 94 U.S. 113; Davies Warehouse Co. v. Bowles, 321 U.S. 144, 148-149. So we start with the assumption that *the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.*"

In *Reid v. Colorado,* 187 U.S. 137, the Supreme Court of the United States said (page 148) : *"It should never be held that Congress intends to supersede or by its legislation suspend the exercise of the police powers of the States,* even when it may do so, *unless* its purpose to effect that result is *clearly manifested.* This court has said—and the principle has been often reaffirmed—that 'in the application of this prin-

ciple of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the *repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together.*"

In *Missouri, Kansas & Texas Ry. Co. v. Haber,* 169 U.S. 613, the question arose as to whether a Kansas statute which made actionable the transporting into Kansas of fever-ridden cattle was superseded by a federal statute which established a Bureau of Animal Industry charged with control of transportation across state lines. The Supreme Court of the United States held that this federal legislation did not override the state statute and said (page 623) : "May not these statutory provisions stand without obstructing or embarrassing the execution of the act of Congress? This question must of course be determined with reference to the settled rule that a statute enacted in execution of a reserved power of the State is *not to be regarded as inconsistent with an act of Congress* passed in the execution of a clear power under the Constitution, *unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or stand together.*"

*Kelly v. Washington,* 302 U. S. 1, sustained the validity of a state statute authorizing a state to inspect tugboats plying the navigable waters of the United States and in a unanimous opinion, speaking through Chief Justice HUGHES, said (page 10) : "The principle is thoroughly established that the exercise by the State of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.' Sinnot v. Davenport, 22 How. 227, 243; Missouri, K. & T. Ry. Co. v. Haber, 169 U. S. 613, 623, 624; Reid v. Colorado, 187 U. S. 137, 148; Crossman

v. Lurman, 192 U. S. 189, 199, 200; Asbell v. Kansas, 209 U. S. 251, 257, 258; Missouri Pacific Ry. Co. v. Larabee Mills, 211 U. S. 612, 623; Savage v. Jones, 225 U. S. 501, 533; Atlantic Coast Line v. Georgia, 234 U. S. 280, 293, 294; Carey v. South Dakota, 250 U. S. 118, 122; Atchison, T. & S. F. Ry. Co. v. Railroad Commission, 283 U. S. 380, 392, 393; Mintz v. Baldwin, 289 U. S. 346, 350. Gilvary v. Cuyahoga Valley Ry. Co., supra."

Certainly it cannot be said that the Smith Act and the Pennsylvania Sedition Act are repugnant or conflicting and cannot be reconciled or stand together; it is equally certain that the Smith Act does not clearly manifest a purpose and intent to supersede or suspend or invalidate the sovereign police powers of a State.

An examination, nay, even a casual reading of the Smith Act, makes the following facts crystal clear and irrefutable:

(1) *The Smith Act and the Pennsylvania Sedition Act are complementary and not repugnant or conflicting; (2) the Smith Act does not directly or expressly prohibit the States from exercising their historic and traditional sovereign powers; nor (3) does it in or by any sentence or any word exclude or negate or supersede or nullify a State's Sovereign police powers; nor (4) does it in or by any sentence or any word manifest clearly or even unclearly any intention to assume complete and exclusive jurisdiction of the subject matter, viz., the crime of sedition.* These facts *alone* are sufficient to demonstrate the utter untenability of the majority opinion which, with nothing to support it, holds that the state police power has been superseded, abridged and destroyed.

But we shall pile Pelion upon Ossa. What was the law prior to the Smith Act (as established in the

State Courts and by decisions of the Supreme Court) ; what were the conditions which caused its passage; what were the mischiefs it sought to remedy; and what are the dire results which will inevitably flow from the majority opinion?

Discussing these seriatim, we shall first consider the Smith Act and the prior decisions of the Supreme Court of the United States in analogous cases.

Section 2(a)(1) of the Smith Act, as amended, makes it unlawful "to knowingly or willfully advocate . . . or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States" [changed by the Amendment of June 25, 1948 to read *"the government of the United States or the government of any state*] by force or violence, . . ." Section 2(a) (3) makes it unlawful "to organize or help to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or *destruction of any government in the United States* [changed to read *"the government of the United States or the government of any state"*] by force or violence.

The language and meaning of the Smith Act are absolutely clear. The majority opinion asserts that in spite of the clear language of the Smith Act, and even though it never said so, Congress clearly intended to supersede and suspend the Pennsylvania Sedition Act. The question that will instantly arise in everyone's mind is this—*if that was the Congressional intent in a matter which concerns the very existence of our Country, why didn't Congress clearly and plainly say so?*

If the language or intent or meaning or effect of an Act is not explicit or clear, the intention of Congress is to be gathered not only from a consideration of the language of the Act but also by examining the prior law upon the subject; the conditions or circum-

stances which caused the enactment or change; the mischief, if any, to be remedied; the goal or objectives to be attained; and the results which will likely flow from a construction contended for by each of the parties involved: Cf. *United States v. C.I.O.*, 335 U.S. 106, 112; *Martin Estate*, 365 Pa. 280, 74 A. 2d 120; *Phipps v. Kirk*, 333 Pa. 478, 5 A. 2d 143; *Orlosky v. Haskell*, 304 Pa. 57, 66, 155 A. 112; *Williamson's Estate*, 368 Pa. 343, 355, 82 A. 2d 49.

At the time of the passage of the revised Smith Act on June 25, 1948, which punished (as we have seen) any person who "knowingly or willfully advocates . . . overthrowing or destroying the government of the United States *or* the government of any State . . . by force or violence . . .", Congress knew the following facts which are very important in determining whether it intended to preempt the field and suspend all State legislation designed to protect our Country from its mortal enemies.

1. State sedition and treason laws were nothing new; they had existed for over 100 years. Congress knew that in spite of the fact that the Constitution of the United States gave it, in Article III, §3(2), the power to punish treason, *forty-seven* (47) Sovereign States of the United States of America, vitally and patriotically concerned with the safety of their citizens, the security of our country and the preservation of their State and Country's Governments, have a Constitutional provision or had passed laws (as early as 1818) punishing the crime of treason.* Congress also knew that *thirty-seven* (37) Sovereign States had over a long period of years passed statutes defining and punishing sedition, syndicalism, and other activities aimed at the overthrow of our government by

---

* Federal Bar Assn. Journal, Vol. 9, p. 71 (1947).

force.* All of these State statutes throughout our entire Country will be superseded and suspended or invalidated, if the majority opinion in this case is sustained by the Supreme Court of the United States.

In 1790 Congress enacted an Act defining and punishing treason.** In 1861 Congress passed the Sedition Conspiracy Act.*** *Never once has the Supreme Court of the United States held that the congressional act punishing treason or the congressional act punishing sedition preempted the field or superseded and nullified state acts punishing these crimes,* or prohibited states from thereafter passing complementary statutes punishing these crimes. While this is not conclusive it is certainly persuasive that Congress did not intend by the Smith Act to supersede and invalidate the mass of state legislation punishing treason, sedition, criminal anarchy, etc., some of which has been in existence for 100 years. Furthermore, *twenty-six* (26) States have passed laws which expressly or in effect *deny state employment* to persons who teach or advocate the overthrow of government by force or violence, or who print or sell documents advocating such doctrines, or who organize groups aimed at overthrowing the government.**** If the majority opinion prevails, isn't it clear as crystal that all these State laws will be superseded and suspended or invalidated by the Smith Act; and if so, what will it cost the States in the way of damages and other remedial actions? And if the majority opinion prevails,

---

* Annual Report of the Committee on Un-American Activities for the year 1949; House Report No. 1950, Union Calendar No. 727, 81st Congress, 2nd session, page 30.

** 18 U. S. C., §§1 and 2.

*** 18 U. S. C., §6.

**** Annual Report of the Committee on Un-American Activities for the year 1949; House Report No. 1950, Union Calendar No. 727, 81st Congress, 2nd session, page 45.

what will happen to all the traitors and dangerous criminals who have been convicted under state acts and whose sentences have not been finally determined, as well as those who are now in state jails serving sentences for violating state treason or sedition or similar laws? And most important of all, what will happen to the security of our Country when the patriotic efforts of all state legislatures, district attorneys and Courts and of all patriotic citizens anxious to catch and punish traitors, are rejected, and the existence of our State and Nation is left exclusively to the slow processes of our sometimes apathetic or inept Federal Government?

2. The Smith Act is patterned after and is almost identical with the New York Statute punishing sedition, the constitutionality of which had been sustained in the famous case of *Gitlow v. New York*, 268 U.S. 652 (1925), which was cited with approval by the Supreme Court of the United States as recently as 1951 in *Dennis v. United States*, 341 U.S. 494.

3. Congress also knew that due to public statements and tidal waves of pro-Russian propaganda issued since 1933 by some of the highest officials of our Government in Washington, the true nature and the real aims and objectives of Communism were so diluted and distorted that for many years they were hidden from the Congress as well as from the American people. Communism by its teachings and by its acts and deeds is our mortal enemy. Marxist Communism, as interpreted, promulgated and established by Stalin, teaches, advocates, plans and plots (a) a world revolution by and for the proletariat; (b) the overthrow and capture of every Government in the world by sabotage, force and violence; and (c) the dictatorial, ruthless, atheistic rule of every Country by ukase and force for the (pretended) benefit of (a tiny percentage of) the proletariat known as Communists.

4. Moreover, Congress at the time it passed the revised Smith Act in 1948 knew more than this. It knew that despite the activities of our wonderful FBI,* communists had infiltrated into many key positions (a) in the State Department, and (b) in many other departments of the Federal Government; it knew that important documents and atomic and other vital secrets had been stolen by or for the communists, thus jeopardizing the safety of our Country; it knew even then that the Federal Government had in many instances failed to protect our Country from the insidious and treacherous acts of communists; and most important of all, it knew that the Federal Government, even if it were willing, had demonstrated that it was unable *alone* to cope with this hidden octopusian menace ✔ to our Country. Congress further knew that our Country needed, in order to combat the widespread and occult perils of communism, the help not only of the FBI and of all Federal district attorneys and all officials in every Federal department and agency of Government, but it also needed the active assistance and cooperation of all States, and all State Courts, and all State officers and agencies, as well as the enthusiastic help of every patriotic American citizen. Congress also knew that juries are sometimes fooled or duped by false testimony or by clever lawyers and thus acquit those who are guilty of grave crimes, and it would certainly be wise to have State officers, State Courts and State juries give to our Country additional help and protection against those who are attempting to destroy our Government.

5. Congress also knew that the States had passed statutes on many subjects and in many analogous

---

* The American people have been shocked by recent revelations showing the extent to which FBI warnings about Communists were ignored by former heads of the Federal Government.

fields over which the Constitution gave power to Congress; and that these statutes had nevertheless been sustained by the Supreme Court of the United States. For example, State Sedition acts had been sustained by the Supreme Court; State acts which regulated or taxed Interstate Commerce had been sustained; State acts pertaining to counterfeiting (although Congress alone had power to coin money and regulate the value thereof) had been sustained; and State acts restricting or regulating labor activities had been sustained under the State's police power even though the Wagner Act, the Taft-Hartley Act and other labor legislation had seemingly preempted the field. Moreover, Congress has enacted statutes punishing the same or similar criminal acts as has the State of Pennsylvania involving firearms, narcotic drugs, explosives, blackmail, conspiracy against rights of citizens, counterfeiting of coins, embezzlement, kidnapping, homicide, prostitution, burglary, wrecking of trains, train robbery, bank robbery, sabotage, treason, lotteries, obscene books and pictures, false and fraudulent bank entries, bribery, violation of election laws, and other crimes, too numerous to mention. Notwithstanding Congressional legislation on these criminal offenses, state prosecutions and indictments under similar state laws have always been sustained.

Congress, with a full knowledge of all of the foregoing facts, passed the Smith Act in 1940 and the revised Smith Act in 1948.

In the light of all these facts, circumstances and conditions and in the face of the decisions of the Supreme Court in analogous cases, how is it possible to assert, as does the majority, that Congress intended, although it never said or even suggested so in a single sentence or by a single word, (1) to supersede and to nullify or suspend all State legislation and all State statutes which protected our Country, and (2)

to preempt the crime of Sedition and give to a Federal Government *which had demonstrated its utter inability* to solve or effectively deal with the problem and menace of Communism, the sole and exclusive right and power to defend our State and Country from the traitors within our ranks. If that had been the Congressional intent, we ask once again, isn't it unbelievable that Congress did not clearly and expressly and specifically say so in the Smith Act? The majority opinion fails to answer this question for the obvious reason that it cannot. But members of Congress and the Attorney General of the United States are not so reticent. The author of the Smith Act—the highly respected and distinguished Congressman, Howard W. Smith, of Virginia, vigorously denies and refutes the majority's theory of supersession. His letter is so clear, pertinent and devastating that we quote the material part at length*:

"Howard W. Smith                    Committee on
8th District, Virginia                    Rules

Calvin H. Haley
    Secretary

CONGRESS OF THE UNITED STATES
House of Representatives
Washington, D. C.
February 4, 1954

Honorable Frank Truscott
Attorney General of Pennsylvania
Department of Justice
Harrisburg, Pennsylvania

---

\* This letter is part of the record in this case. It was submitted by the Attorney General of Pennsylvania (who protested the majority decision) as one of his reasons or grounds for a reargument of this case.

Dear Mr. Attorney General:

. . .

"As I am the author of the Federal act in question, known as the Smith Act, I am deeply disturbed by the implications of this decision. May I say that when I read this opinion, it was the first intimation I have ever had, either in the preparation of the act, in the hearings before the Judiciary Committee, in the debates in the House, or in any subsequent development, that Congress ever had the faintest notion of nullifying the concurrent jurisdiction of the respective sovereign states to pursue also their own prosecutions for subversive activities. It would be a severe handicap to the successful stamping out of subversive activities if no state authority were permitted to assist in the elimination of this evil, or to protect its own sovereignty. The whole tenor and purpose of the Smith Act was to eliminate subversive activities, and not assist them, which latter might well be the effect of the decision in the Commonwealth v. Nelson case.

"I hope you will not think me presumptuous in taking this matter up with you, but you can readily understand how deeply disturbed I am about it. . . .

Sincerely yours,

Howard W. Smith."

In the "Brief for the United States" filed by the Attorney General in the case of *Dennis v. United States*, 341 U. S., supra (1951), the Attorney General devoted many pages to sustain his contention that the Smith Act was Constitutional because it was a part of a large mass of valid *State* and Federal legislation which punished sedition and subversive activities. He said, inter alia: "3. The other American statutes dealing with political extremism. It is significant to note that the Smith Act is part of a large body of legislation, both State and Federal, directed against political extremism. . . . a) State legislation. All or nearly all of the

States have enacted legislation dealing with political extremism. This legislation takes a variety of forms, depending partly upon the time and circumstances of enactment. Some of the statutes date from the Civil War, others are a response to the alleged menace of the I.W.W. and to the violent anarchism which resulted in the assassination of President McKinley. Many of the state statutes date from 1917 and the Russian Revolution. However, since 1940, there has been enacted a considerable number of state statutes dealing either by name or by clear implication with Communism and Fascism. In the interest of brevity, we will not attempt to describe here this mass of state legislation.

"However, the more recently enacted state statutes reveal the evils anticipated by the American state legislatures from Communism and Fascism. Thus, in 1945, Illinois provided . . . .

"This mass of state and Federal legislation reflects the Nation's awareness of the fact that the danger to free countries is not from direct and domestic insurrectionary movements but from the more subtle alliance of domestic political groups with foreign "governments with whose ideology they are sympathetic and whose policies they serve."

In the light of that letter from Congressman and former Judge Howard W. Smith and in the face of the brief of the Attorney General of the United States in the *Dennis* case, how is it possible for this Court to say that Congress "intended" to supersede and nullify State laws punishing Sedition?

If any possible doubt could possibly remain, it would be forever dissipated by the fact that the Federal Code of Crimes and Criminal Procedure of 1948, of which the Smith Act is now a codified part, expressly states in §3231: "Nothing in this title shall be

held to take away or impair the jurisdiction of the courts of the several states under the laws thereof."

Although no further confirmation is needed, we shall multiply the overwhelming proof and point out that the authorities further confirm the validity and constitutionality of the State Sedition Act.

*Gilbert v. Minnesota*, 254 U.S. 325, is analogous to and *in principle* controls the instant case. In that case a statute of Minnesota made it unlawful to discourage the enlistment of men in the military or naval forces of the United States or of the State of Minnesota, and by another section unlawful for any person to teach or advocate that the citizens of Minnesota should not assist the United States in carrying on war with its public enemies. The statute was sustained as an exercise of the police power and also as a legitimate measure of cooperation by the State with the United States. It was held not to be in conflict with the federal war power nor with the Constitutional right of free speech. It was argued that Congress had the exclusive power to declare war and to determine among other things the conditions of enlistment; and consequently, just as here, it was contended the states had no such power, especially as their acts might run counter to what Congress or the army or navy might consider the wisest and most effective means of securing support from all the citizens. The *minority* opinion in that case held, as does the *majority* opinion in this case, that the state statute was inconsistent with the law of the United States and a cause of real embarrassment and danger to the Federal Government and consequently unconstitutional. All of these arguments or contentions were rejected by the majority which in its opinion said (page 328) : "Undoubtedly, the United States can declare war and it, not the States, has the power to raise and maintain armies. But there are other considerations. The United States is composed of the

States, the States are constituted of the citizens of the United States, who also are citizens of the States, and it is from these citizens that armies are raised and wars waged, and whether to victory and its benefits, or to defeat and its calamities, the States as well as the United States are intimately concerned. . . . *from the contention that it encroaches upon or usurps any power of Congress, there is an instinctive and immediate revolt.* Cold and technical reasoning in its minute consideration may indeed insist on a separation of the sovereignties and resistance in each to any cooperation from the other, but there is opposing demonstration in the fact that this country is one composed of many and must on occasions be animated as one and that *the constituted and constituting sovereignties must have power of cooperation against the enemies of all.* . . . The same view of the statute was expressed in State v. Holm, 139 Minnesota, 267, where, after a full discussion, the contention was rejected that the Espionage Law of June 15, 1917, abrogated or superseded the statute, the court declaring that the fact that the citizens of the State are also citizens of the United States and owe a duty to the Nation, does not absolve them from duty to the State *or preclude a State from enforcing such duty. 'The same act,'* it was said, *'may be an offense or transgression of the laws of both'* Nation and State, and both may punish it *without a conflict of their sovereignties.* Numerous cases were cited commencing with Moore v. Illinois, 14 How. 13, and terminating with Halter v. Nebraska. 205 U.S. 34.

"The latter case is especially pertinent in its sentiment and reasoning. It sustained a statute of Nebraska directed against the debasement of the National flag to trade uses against the contention that the flag being the National emblem was subject only to the control of the National power. In sustaining the stat-

ute it was recognized that in a degradation of the flag there is a degradation of all of which it is the symbol, that is, 'the National power and National honor' and what they represent and have in trust. To maintain and reverence these, to 'encourage patriotism and love of country among its people,' may be affirmed, it was said, to be a duty that rests upon each State, and that 'when, by its legislation, the State encourages a feeling of patriotism towards the Nation, it necessarily encourages a like feeling towards the State.'

"And so with the statute of Minnesota. An army is an instrument of government, a necessity of its power and honor, and it may be, of its security. An army, of course, can only be raised and directed by Congress, in neither has the State power, but it has power to regulate the conduct of its citizens and to restrain the exertion of baleful influences against the promptings of patriotic duty to the detriment of the welfare of the Nation and State. To do so is not to usurp a National power, it is only to render a service to its people, as Nebraska rendered a service to its people when it inhibited the debasement of the flag.

"We concur, therefore, in the final conclusion of the court, that *the State is not inhibited from making* '*the national purposes its own purposes* to the extent of exerting its police power to prevent its own citizens from obstructing the accomplishment of such purposes.'

"The statute, indeed, may be supported as a simple exertion of the police power to preserve the peace of the State. . . . 'It is simply a local police measure, aimed to suppress a species of seditious speech which the legislature of the State has found objectionable.' "

It is apparent that there is far less justification in the instant case for the majority theory of supersession than there was for the minority view in *Gil-*

*bert v. Minnesota.* All of Nelson's arguments in this case and all of the theories of the majority were, we repeat, rejected by the Supreme Court in *Gilbert v. Minnesota.* Moreover, the Supreme Court cited with approval the *Holm* case, supra, which sustained a state statute dealing with Espionage and rejected the contention that the Espionage Law of 1917 abrogated or superseded a state statute, and specifically held that the citizens of each state owe a duty to the state as well as to the nation and that nothing precluded a state from enforcing such duty since our sovereign federal government needed the cooperation of its constituent sovereignties against the enemy of all. Moreover, as the Supreme Court there said, the same act may be an offense or transgression of the laws of both the nation and the state and both may punish it without a conflict of their sovereignties.

It is to be noted that the state statute in the *Gilbert* case was sustained both as a legitimate measure of cooperation by the state with the United States and as an exercise of the police power to preserve the peace of the State. These two grounds are present here with even greater cogency than there.

The majority opinion has signally failed to distinguish the *Gilbert-Minnesota* case or the famous *Gitlow* case or the *Whitney* or *Fox* or *Holm* or *Halter* cases.

*Gitlow v. New York,* 268 U.S. 652, is both analogous and in principle controlling. In 1909 the State of New York passed an Act *which prohibited the advocacy or teaching the necessity of overthrowing organized government by force or violence.* Benjamin Gitlow, noted communist, was indicted and convicted under this statute and given a five to ten year sentence. He appealed to the Supreme Court of the United States contending that the statute under which he was convicted violated the freedom of speech and press guaranteed by the

First and Fourteenth Amendments to the United
States Constitution. The decision of the Supreme
Court, affirming the conviction, has become famous as
the *Gitlow* case (*Gitlow v. New York*, 268 U.S. 652).
The Supreme Court said: "That a State in the exer-
cise of its police power may punish those who abuse
this freedom by utterances inimical to the public wel-
fare, tending to corrupt public morals, incite to crime,
or disturb the public peace, is not open to question.
Robertson v. Baldwin, supra, p. 281; Patterson v.
Colorado, supra, p. 462; Fox v. Washington, supra,
p. 277; Gilbert v. Minnesota, supra, p. 339; People v.
Most, 171 N.Y. 423, 431; State v. Holm, 139 Minn.
267, 275; State v. Hennessy, 114 Wash. 351, 359;
State v. Boyd, 86 N.J.L. 75, 79; State v. McKee, 73
Conn. 18, 27. Thus it was held by this Court in the
*Fox Case,* that a State may punish publications ad-
vocating and encouraging a breach of its criminal
laws; and, in the *Gilbert Case,* that a State may pun-
ish utterances teaching or advocating that its citizens
should not assist the United States in prosecuting or
carrying on war with its public enemies.

"And, for yet more imperative reasons, a State may
punish utterances endangering the foundations of or-
ganized government and threatening its overthrow by
unlawful means. These imperil its own existence as a
constitutional State. . . . By enacting the present stat-
ute the State has determined, through its legislative
body, that utterances advocating the overthrow of gov-
ernment by force, violence and unlawful means, are so
inimical to the general welfare and involve such danger
of substantive evil that they may be penalized in the
exercise of its police power."

Another analogous case is *Whitney v. California,*
274 U. S. 357. That case sustained a conviction under
the California Criminal Syndicalism Act, which like
the New York statute in the *Gitlow* case, specifically

prohibited advocating or teaching or aiding an organization to advocate certain criminal acts, to effect any political change by force, violence or terrorism. The Court said (page 371): "That the freedom of speech which is secured by the Constitution does not confer an absolute right to speak, without responsibility, whatever one may choose, or an unrestricted and unbridled license giving immunity for every possible use of language and preventing the punishment of those who abuse this freedom; and *that a State in the exercise of its police power* may punish those who abuse this freedom by utterances inimical to the public welfare, tending to incite to crime, disturb the public peace, *or endanger the foundations of organized government* and threaten its overthrow by unlawful means, *is not open to question."*

Cases in other analogous fields likewise demonstrate how untenable the majority opinion is. A leading case is *Fox v. Ohio,* 46 U. S. 410. The defendant in that case was indicted, convicted and sentenced under an Ohio statute for passing " 'a certain piece of false, base, counterfeit coin, forged and counterfeited to the likeness and similitude of the good and legal silver coin, currently passing in the State of Ohio, called a dollar.' "

There is no field or activity in our country in which the federal government has a more *exclusive monopoly* than that which has to do with the monetary system of the United States. Article I, §8 of the Constitution of the United States gives Congress power to "coin Money, regulate the Value thereof . . . [and] To provide for the Punishment of counterfeiting the Securities and current Coin of the United States." The states have no such power under the Constitution or under any Act of Congress.

Nevertheless, the defendant's conviction was affirmed by the Supreme Court of the United States,

which held that the crime punishable under the Ohio statute *"is deemed by this court to be clearly within the rightful power and jurisdiction of the State.* So far, then, neither the statute in question, nor the conviction and sentence founded upon it, can be held as violating either the constitution or any law of the United States made in pursuance thereof." Could anything be more analogous or decisive? The same arguments made here by defendant Nelson and sustained by a majority of this Court were there made and rejected by the Supreme Court of the United States. For example, Fox argued that since the State Government and the Federal Government had legislated on the same subject, *"an individual* under these separate jurisdictions *might be liable to be twice punished for the one and the same crime,* and that this would be in violation of the fifth article of the amendments to the constitution, declaring that no person shall be subject for the same offense to be twice put in jeopardy of life or limb." In answer to this argument the Court said: "The prohibition alluded to as contained in the amendments to the constitution, as well as others with which it is associated in those articles, were *not designed as limits upon the State governments* in reference to their own citizens. They are exclusively restrictions upon federal power, intended to prevent interference with the rights of the States, and of their citizens."

The language of the Attorney General of Ohio is equally applicable to the instant case which differs only in its greater magnitude and importance: "Such a jurisdiction, if not indispensable, is to the last degree useful and expedient. And it has been exercised almost, if not quite, universally by the different States which compose the Union. The rightfulness of this jurisdiction is now, for the first time, questioned in this Court. Certainly it presents a question of the first

magnitude, for *no one can foresee what may be the consequences of taking from the States the power of self-protection, which they have so long exercised, against a class of criminals swarming over the entire Union, and against a species of crime which, more than any other, affects the common business of the people.*"

Powerful as is our Federal Government, extensive as are its departments and ramifications, wonderful as is the FBI, there are still not nearly enough FBI agents, United States district attorneys, marshals and agencies to cope with this far-flung masked threat against the very life of our American System of Government.

Cases in other fields over which Congress is generally considered to have exclusive jurisdiction further demonstrate the error of the majority opinion. For example, Congress is given by Article I, §8, Clause 3 of the Constitution of the United States the power to regulate interstate commerce. This power Congress has exercised in numerous acts. Nevertheless, it is now well settled that a state can regulate as well as tax interstate commerce for limited purposes, such as local activities or for the use of its highways or local facilities: *Interstate Busses Corp. v. Blodgett*, 276 U. S. 245; *Dixie Ohio Express Co. v. State Revenue Comm.*, 306 U. S. 72; *Clark v. Gray, Inc.*, 306 U. S. 583; *Hendrick v. Maryland*, 235 U. S. 610; *Capitol Greyhound Lines v. Brice*, 339 U. S. 542; *Aero Transit Co. v. Commissioners*, 332 U. S. 495; *Shirks Motor Express Corp. v. Messner*, 375 Pa. 450, 100 A. 2d 913; *Keystone Metal Co. v. Pittsburgh*, 374 Pa. 323, 97 A. 2d 797; *Southern Pacific Co. v. Gallagher*, 306 U. S. 167, 176; *McGoldrick v. Berwind-White Coal Mining Co.*, 309 U. S. 33, 58; *Western Live Stock v. Bureau of Revenue*, 303 U. S. 250; *International Harvester Co. v. Department of Treasury*, 322 U. S. 340; *Norton Company v. Department of Revenue of Illinois*, 340 U. S. 534; *Missouri Pacific Ry. Co. v. Larabee Mills*, 211 U. S. 612.

Congress has assumed what many believed was complete and therefore exclusive jurisdiction in the labor-management field under the Acts popularly known as the Wagner Act and the Taft-Hartley Act. The question has frequently arisen whether Congress by such Acts clearly manifested an intention to supersede all state police power in this field. This question has been resolved by the Supreme Court in favor of the States in many cases where the State statute was sustained: *Hughes v. Superior Court of California*, 339 U. S. 460; *Bakers & Pastry Drivers v. Wohl*, 315 U. S. 769; *Dorchy v. Kansas*, 272 U. S. 306; *Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.*, 312 U. S. 287; *Hotel & Restaurant Employees' International Alliance, etc. v. Wisconsin E. R. Bd.*, 315 U. S. 437; *Carpenters & Joiners Union v. Ritter's Cafe*, 315 U. S. 722; *Giboney v. Empire Storage & Ice Co.*, 336 U. S. 490; *Wortex Mills v. Textile Workers Union*, 369 Pa. 359, 85 A. 2d 851.

All of these analogous cases demonstrate that the police power of a state, especially where it attempts to protect the very life and existence of our State and Federal Governments, must be sustained unless restricted or prohibited by the Constitution, or clearly, expressly and validly prohibited by Congress, or unless Congress has clearly and validly manifested an intention to exclude the States from exercising their police power on the matter in question.

The only decision cited by the majority which, in my judgment, might be said to even remotely support its application of the supersession doctrine is *Hines v. Davidowitz*, 312 U. S. 52. Congress had passed the Federal Alien Registration Act of 1940 which, together with the Immigration and Naturalization Laws, constituted, as the Court pointed out, a comprehensive and integrated plan for the regulation of all aliens (14 years of age and over) and precluded the enforcement

of State Alien Registration Acts. The Court said, inter alia (page 63) : "The Federal Government, representing as it does the collective interests of the forty-eight states, is entrusted with full and *exclusive responsibility for the conduct of affairs with foreign sovereignties.* . . . Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that *federal power in the field affecting foreign relations* be left entirely free from local interference."

A reading of the majority opinion makes it clear that the basis for the decision was the Court's conviction that a State Alien Registration Act would likely involve us in grave international controversies and might even lead to war. No such result could possibly ensue from State treason or Sedition laws; and the case is clearly distinguishable on its facts.

If there were any doubt on this issue, and in my judgment there is none, it would be resolved by the recent decision of the Supreme Court of the United States in *Dennis v. U. S.,* 341 U. S. 494 (1951). In that case Dennis and others were convicted of conspiring to organize a Communist Party to teach and advocate the overthrow of the government of the United States by force and violence. The Court sustained the constitutionality of the Smith Act and held that it did not violate the First or Fifth Amendments or any other provision of the Bill of Rights. In the course of its opinion, *Gitlow v. New York,* 268 U. S. supra, and *Whitney v. California,* 274 U. S., supra, were cited or discussed with approval (pages 505, 506, 536, 537).

If the contentions of the defendant, Nelson, which the majority of this Court adopt, were legally sound, isn't it reasonable to assume that the Supreme Court of the United States would have pointed out that the

New York statute, which was the model for and almost identical with the Smith Act (as well as with the California Syndicalism Act) had been superseded and suspended or invalidated by the Smith Act, instead of quoting and discussing these cases with approval!

The majority seeks to support its application of the doctrine of "supersession" by stating that "The old saying that 'Self-preservation is the first law of nature' is as true of nations as it is of animal life"; and then goes on to illogically, impractically and unjustifiably deny the first law of nature to a Sovereign State. It seems inconceivable to me that anyone would deny to a Sovereign State the right of self-preservation, or even deny its right (except where Constitutionally limited or prohibited) to help preserve the Government of the United States, of which each State is a basic, component, constituent, indispensable part.

It seems necessary to recall and to frequently reiterate that a State has an inalienable right and an inescapable duty to protect the life, liberty and property of its citizens, and in their behalf to preserve its own existence and the existence of our National Government: *Thornhill v. Alabama,* 310 U. S. 88, 105; *Carlson v. California,* 310 U. S. 106, 113; *Wortex Mills v. Textile Workers,* 369 Pa. 359, 85 A. 2d 851.

II. *Double Jeopardy.*

In addition to the principle of "preemption and supersession by implication", the majority advance a second reason to support their position, namely, Pennsylvania's Act must be suspended or invalidated because otherwise Nelson would be subjected to double jeopardy, i. e., he might be convicted in every State where he plotted the overthrow of our Country or of the Government of that particular State. We may appropriately ask why shouldn't he be convicted and punished in every State and in every County where

he commits a separate crime? If there is any principle well settled in criminal law it is that a person may be indicted, tried, convicted and sentenced for every separate criminal offense he commits in that County! See: *United States v. Lanza,* 260 U. S. 377; *McKelvey v. United States,* 260 U. S. 353; *Com. v. McCusker,* 363 Pa. 450, 458, 70 A. 2d 273; *Com. v. Valotta,* 279 Pa. 84, 88, 123 A. 681; *Albrecht v. United States,* 273 U. S. 1; *Com. ex rel. Garland v. Ashe,* 344 Pa. 407, 408, 26 A. 2d 190.

The error of the majority's position on the subject of double jeopardy is made more conspicuous by their failure to cite any authority to support it. The reason for the omission is obvious—the authorities hold exactly to the contrary.

The fact that the same or similar criminal or traitorous offenses are prohibited by a State Act as well as by an Act of Congress does not violate any provision of the Constitution of the United States or of the Commonwealth of Pennsylvania or constitute double jeopardy, since a person by the same act can commit two distinct criminal offenses, one against the United States and one against the State, and may be subjected to prosecution and punishment in the Federal Courts for the one and in the State Courts for the other: *United States v. Lanza,* 260 U. S. 377, 381-384; *Barron v. Baltimore,* 7 Peters 243; *Fox v. Ohio,* 46 U. S. 410; *United States v. Marigold,* 50 U. S. 560, 569; *Moore v. Illinois,* 55 U. S. 13, 19, 20; *United States v. Cruikshank,* 92 U. S. 542, 550; *Ex parte Siebold,* 100 U. S. 371, 390; *Cross v. North Carolina,* 132 U. S. 131, 139; *Pettibone v. United States,* 148 U. S. 197, 209; *Crossley v. California,* 168 U. S. 640; *Southern Railway Co. v. R. R. Commission of Indiana,* 236 U. S. 439, 445; *Gilbert v. Minnesota,* 254 U. S. 325, 330; *McKelvey v. United States,* 260 U. S. 353, 358, 359; *Hebert v. Louisiana,* 272 U. S. 312; *Sexton v. California,* 189

U. S. 319; *Westfall v. United States,* 274 U. S. 256; *Com. ex rel. Garland v. Ashe,* 344 Pa., supra.

In *Gilbert v. Minnesota,* 254 U. S. 325, 330, the Court said: " 'The same act,' . . . 'may be an offense or transgression of the laws of both' Nation and State, and both may punish it without a conflict of their sovereignties."

In *United States v. Lanza,* 260 U. S. 377, the defendants were charged in both the Federal Court and in the County Court of Washington with manufacturing and possessing intoxicating liquor. Defendants contended that punishment under separate Federal and State indictments for these same offenses subjected them to double jeopardy since both the National Government and the State were each punishing them for the same act. This contention was rejected by the Supreme Court of the United States. The Court held that the United States derived its power to punish the crime by virtue of the Eighteenth Amendment, whereas the States, although given concurrent power to punish the crime by the Amendment, possessed such power prior thereto by virtue of its police power. The Court then said:

"To regard the Amendment as the source of the power of the States to adopt and enforce prohibition measures is to take a partial and erroneous view of the matter. Save for some restrictions arising out of the Federal Constitution, chiefly the commerce clause. each State possessed that power in full measure prior to the Amendment, and the probable purpose of declaring a concurrent power to be in the States was to negative any possible inference that in vesting the National Government with the power of country-wide prohibition, state power would be excluded. . . .

"We have here two sovereignties, deriving power from different sources, capable of dealing with the same subject-matter within the same territory. Each

may, without interference by the other, enact laws to secure prohibition, . . . . Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.

"It follows that *an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.* The Fifth Amendment, like all the other guaranties in the first eight amendments, applies only to proceedings by the Federal Government, Barron v. Baltimore, 7 Pet. 243, and *the double jeopardy therein forbidden is a second prosecution under authority of the Federal Government after a first trial for the same offense under the same authority.* Here the same act was an offense against the State of Washington, because a violation of its law, and also an offense against the United States under the National Prohibition Act. The defendants thus committed two different offenses by the same act, and a conviction by a court of Washington of the offense against that State is not a conviction of the different offense against the United States and so is not double jeopardy.

"This view of the Fifth Amendment is supported by a long line of decisions by this Court. In Fox v. Ohio, 5 How. 410, a judgment of the Supreme Court of Ohio was under review. It affirmed a conviction under a state law punishing the uttering of a false United States silver dollar. The law was attacked as beyond the power of the State. One ground urged was that, as the coinage of the dollar was entrusted by the Constitution to Congress, it had authority to protect it against false coins by prohibiting not only the act of making them but also the act of uttering them. It was contended that if the State could denounce the uttering, there would be concurrent jurisdiction in the United States and the State, a conviction in the state

court would be a bar to prosecution in a federal court, and thus a State might confuse or embarrass the Federal Government in the exercise of its power to protect its lawful coinage. . . . [The Court rejected this contention and further said, page 383]:

". . . in United States v. Marigold, 9 How. 560, 569, . . . the same Justice said that *the same act might, as to its character and tendencies, and the consequences it involved, constitute an offense against both the State and Federal Governments,* and might draw to its commission the penalties denounced by either, as appropriate to its character in reference to each.'

"The principle was reaffirmed in Moore v. Illinois, 14 How. 13; in United States v. Cruikshank, 92 U. S. 542, 550, 551; in Ex parte Siebold, 100 U. S. 371, 389, 390, 391; in Cross v. North Carolina, 132 U. S. 131, 139; in Pettibone v. United States, 148 U. S. 197, 209; in Crossley v. California, 168 U. S. 640, 641; in Southern Ry. Co. v. Railroad Commission of Indiana, 236 U. S. 439; in Gilbert v. Minnesota, 254 U. S. 325, 330, and, finally, in McKelvey v. United States, [260 U. S.] 353.

"In Southern Ry. Co. v. Railroad Commission of Indiana, supra, Mr. Justice Lamar used this language (p. 445): 'In support of this position numerous cases are cited which, like Cross v. North Carolina, 132 U. S. 131, hold that *the same act may constitute a criminal offense against two sovereignties, and that punishment by one does not prevent punishment by the other.* That doctrine is thoroughly established. . . .'"

In McKelvey v. United States, 260 U. S. 353, 358, the Court said: "The following excerpt from Moore v. Illinois, 14 How. 13, 20, is pertinent: 'The same act may be an offence or transgression of the laws of both. Thus, an assault upon the marshal of the United States, and hindering him in the execution of legal process, is a high offence against the United States,

for which the perpetrator is liable to punishment; and the same act may be also a gross breach of the peace of the State, a riot, assault, or a murder, and subject the same person to a punishment, under the State laws, for a misdemeanor or felony. That either or both may (if they see fit) punish such an offender, cannot be doubted. Yet it cannot be truly averred that the offender has been twice punished for the same offence; but only that *by one act he has committed two offences, for each of which he is justly punishable.'* "

Another analogous case is *Sexton v. California,* 189 U. S. 319. In that case the Revised Statutes of the United States provided that a person who received money as a consideration for not informing against any violation of any internal revenue law should, on conviction, be punished by a fine not exceeding $2000 or by imprisonment not exceeding one year, or both; and gave exclusive jurisdiction of such offenses to the Courts of the United States. Defendant was indicted, convicted and sentenced in a State Court for extorting money by threatening to accuse Greenwald of an offense under the Federal Statute. The conviction was sustained by the Supreme Court of the United States because the defendant was charged with and punished for the violation of the State crime of extortion.

In *Com. ex rel. Garland v. Ashe,* 344 Pa., supra, the Supreme Court of Pennsylvania said (page 408): "The relator's petition must be dismissed. The Fifth Amendment to the Federal Constitution which declares that no person shall for the same offense be twice put in jeopardy of life or limb is a restriction only on the power of the Federal Government: Hurtado v. California, 110 U. S. 516, 534. The tenth section of the Pennsylvania Bill of Rights also contains a prohibition against a person being 'twice put in jeopardy of life or limb' and is a restriction on the power of the state government. But the same act *'denounced as a*

*crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each.* The double jeopardy therein forbidden [i.e., in the Fifth Amendment] is a second prosecution under authority of the Federal Government after a first trial for the same offense under the same authority.' :* United States v. Lanza, 260 U. S. 377, 382."

The foregoing authorities completely demolish Nelson's contention and the majority opinion's theory of double jeopardy.

For each and every one of the foregoing reasons, I dissent from the decision of the Court.**

---

* The majority, in an attempt to buttress this part of their opinion, improperly state, based upon newspaper reports, that Nelson, subsequent to his conviction in a State Court in the instant case, was convicted of this same offense in a District Court of the United States and was sentenced to 5 years' imprisonment; and that "the acts proven in the Federal Court to effectuate the alleged conspiracy [to violate the Smith Act] consisted of practically the same matter as was offered against Nelson in the trial in the State Court." *None of this was a part of the Record* in the instant case. There is no evidence in this Record that Nelson was subsequently tried and convicted in a Court of the United States, nor is there any evidence herein of the crime or crimes of which Nelson was charged and convicted in the United States Court; nor do we know whether the evidence was the same in both cases or whether the crimes charged were based upon the same acts. The majority omit to mention that the newspapers state that Nelson has appealed from the Federal convictions. However, the majority's reliance upon newspaper reports is, in my judgment, of no moment, since in no event could it constitute double jeopardy.

** It will not escape notice that except for four of the Judges of this Court, all of the Judges of Pennsylvania who have considered the constitutional question here involved, including the Superior Court, are in accord that Pennsylvania's Act has *not* been superseded or invalidated by the Smith Act.