Whitehall Laboratories, Appellant, *v.* Wilbar.

Argued May 25, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES and BOK, JJ.

*Samuel A. Schreckengaust, Jr.*, with him *McNees, Wallace & Nurick,* for appellant.

*Joseph L. Cohen,* Deputy Attorney General, and *Anne X. Alpern,* Attorney General, with them *Elmer T. Bolla,* Deputy Attorney General, for appellee.

*William D. Boswell,* and *Compton, Handler, Berman & Boswell,* for amicus curiae.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, September 28, 1959:

This appeal presents for review the propriety of a decree of the Court of Common Pleas of Dauphin County, sitting in equity, which decree affirmed the action of the Secretary of Health of the Commonwealth of Pennsylvania in his refusal to exempt a drug called "Primatene" from the prescription-dispensing requirements of "The Dangerous Drug Act of 1955".[1]

Whitehall Laboratories Division of American Home Products Corporation (herein termed Whitehall) manufactured and placed on the market in 1954 a drug called "Primatene", the purpose of which was the relief of bronchial asthma and hay fever. Each tablet of "Primatene" contains the following active ingredients: 2 gr. theophylline, ⅜ gr. ephedrine hydrochloride and ⅛ gr. phenobarbital, the latter "a chemical derivative of barbituric acid".

---

[1] Act of Dec. 28, 1955, P. L. 913, 35 PS §935.1 et seq.

The Federal Food, Drug and Cosmetic Act,[2] §502 provides: "A drug or device shall be deemed to be misbranded— . . . (d) if it is for use by man and contains any quantity of the narcotic or hypnotic substance . . . barbituric acid . . . or any chemical derivative of such substance, which derivative has been by the Secretary after investigation, found to be . . . habit forming . . . ." unless the label of the drug bears the name, quantity or proportion of such derivative and "in juxtaposition therewith the statement 'Warning—May be habit forming' " Such labelling is required of "Primatene" inasmuch as it contains phenobarbital a "chemical derivative" of "barbituric acid". That Act further provides that a "habit forming" drug shall be dispensed only upon a written prescription (§503(b)(1)) and any such drug shall be deemed misbranded if it fails to bear the statement: "Caution: Federal Law prohibits dispensing without prescription" (§503(b)(4)). The Act further empowers the federal Secretary to remove drugs from the prescription-dispensing requirements when such requirements are not necessary for the protection of the public health (§503(b)(3)), and, by virtue of such authority, the federal Secretary has promulgated a regulation[3] the effect of which is to exempt a drug such as "Primatene" from the prescription-dispensing requirements. Under the Federal law, therefore, while "Primatene" must bear the cautionary label as to the possibility of "habit forming", yet it may be dispensed without a prescription.

In Pennsylvania the legislature has passed an act known as "The Dangerous Drug Act of 1955". Insofar as herein pertinent, that Act provides that a "dangerous drug" is a "drug intended for use by man; which

---

[2] Act of June 25, 1938, 52 Stat. 1040, as amended, 21 U.S.C.A. (pkt. pt.) §301 et seq.

[3] Regulation 1.108.

(a) contains any quantity of barbituric acid . . . or any chemical derivative thereof, which derivative has been by the Secretary of Health . . . found to be and by regulations designated as a dangerous drug;[4] or (b) because of its . . . potentiality . . . for harmful effect . . . is not safe for use, except under the supervision of a practitioner, licensed by law, to administer or prescribe such drug."[5] The Secretary of Health is given the authority, by regulation, to remove drugs which are subject to §2(1)(a), supra, from the prescription-dispensing requirements "when such requirements are not necessary for the protection of the public health: Provided, that such regulations shall conform unless cogent reasons require otherwise in the interest of public health, as far as possible with regulations promulgated under the provision of the Federal Food, Drug and Cosmetic Act".[6] Section 7 of the Act authorized the Secretary of Health "to make such rules and regulations as may be deemed necessary for the proper enforcement of this act . . . ."

On September 27, 1956 the Secretary of Health—after granting Whitehall the opportunity to be heard in the statutory manner,—*under Section 2(1)(b)*, supra, promulgated a regulation the pertinent portion of which regulation provides: ". . . the following are to be considered dangerous drugs: (1) any drug which carries the following legend or legends as required by the Federal Food, Drug and Cosmetic Act: (a) 'Warning: May be habit forming' . . . (2) Those drugs which are similar in amount, kind and quality of active in-

---

[4] Section 2(1)(a). Such a finding by the Secretary of Health must be only after investigation, consultation and advice of the Advisory Health Board of the Department of Health, the secretaries of various named associations representing physicians, etc. and other parties in interest.

[5] Section 2(1)(b).

[6] Section 3.

gredients, method of administration and in any other significant way with preparations required under the Federal Food, Drug and Cosmetic Act to be sold or distributed with any one or more of the following legends: (b) 'Warning: May be habit forming' . . . .". The result of this regulation is that "Primatene" is classified as a "dangerous drug" dispensable only upon prescription in the Commonwealth of Pennsylvania.

Upon the promulgation of this regulation Whitehall instituted a suit in equity in the Court of Common Pleas of Dauphin County in which it sought to enjoin the enforcement of this regulation upon the grounds that it violated the Constitution of both the United States and Pennsylvania in its applicability to "Primatene" and was in conflict with the federal legislation on the subject. Upon issue joined the matter was heard before the Honorable WILLIAM H. NEELY who dismissed the equity action. After approval of his action by the court en banc, this appeal was taken.

Whitehall's arguments are threefold: (1) that, by the adoption of the Federal Food, Drug and Cosmetic Act, the federal government has pre-empted the field of regulation of the sale and dispensing of drugs held for sale after shipment in interstate commerce; (2) that the Secretary of Health of the Commonwealth lacked the statutory authority to promulgate this regulation; (3) that the evidence fails to support the findings of the court below that "Primatene" is a dangerous drug under the statutory standard. We will consider each contention separately.

Whether the federal government has pre-empted a particular field to the exclusion of state action therein is a matter of some confusion. Our present Chief Justice has well stated the background of the question of federal pre-emption in *Commonwealth v. Nelson*, 377 Pa. 58, 64, 65, 104 A. 2d 133, aff'd. 350 U. S. 497,

76 S. Ct. 477: "Under our federal system, as is generally known, there are functions of government which a State may not exercise because such matters have been committed, either expressly or impliedly, by the Constitution of the United States to the care of the Federal Government: see Tennessee v. Davis, 100 U. S. 257, 266. A State may not, for instance, set up its own postal system, coin money, impose duties on imports or exports, declare war, make treaties or do a number of things which are exclusively within the federal province. There are, however, other matters with respect to which both the Federal Government and a State may concurrently legislate. But, even there, if the inference is reasonably deducible that it was the purpose of Congress by its enactment to pre-empt the particular field, State legislation on the same subject is automatically suspended. This is so regardless of the validity in general of the state statute which is simply superseded and, thus, rendered inefficacious so long as the federal statute endures". It is Whitehall's contention that the "Dangerous Drug Act of 1955" falls within the latter category.

"The criteria for determining the congressional purpose in such connection may be evidenced in several ways as was indicated by the Supreme Court in Rice v. Santa Fe Elevator Corp., 331 U. S. 218, 230, where it was said that 'The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Pennsylvania R. Co. v. Public Service Comm'n., 250 U. S. 566, 569; Cloverleaf Butter Co. v. Patterson, 315 U. S. 148. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of the state laws on the same subject. Hines v. Davidowitz, 312 U. S. 52. Likewise,

the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. [citing cases]. Or the state policy may produce a result inconsistent with the objective of the federal statute. Hill v. Florida, 325 U. S. 538": *Commonwealth v. Nelson*, supra, 65.

In passing upon this issue we must also be mindful of the fact that the legislature in its passage of the "Dangerous Drug Act of 1955" was exercising its police power in the protection of the health and safety of the citizens of this Commonwealth. In weighing the exercise of such police power we must recall that which the United States Supreme Court said in *Allen Bradley Local v. Wisconsin E. R. Board*, 315 U. S. 740, 749: ". . . this Court has long insisted that an 'intention of Congress to exclude States from exerting their policy power must be clearly manifested' [citing cases]". See also: *Auto Workers v. Wisconsin E. R. Board*, 336 U. S. 245, 253; *Missouri, Kansas & Texas Ry. Co. v. Haber*, 169 U. S. 613. That such an intention may arise both from the direct language of the federal statute or the purpose of its passage is too clear to require argument or citation of authorities.

The instant statute of the Congress—the Federal Food, Drug and Cosmetic Act, supra,—is silent on the question of whether it supersedes any state action in the same field. Its purpose has been set forth in *U. S. v. Sullivan*, 332 U. S. 689, 696: ". . . [T]he Act as a whole was designed primarily to protect consumers from dangerous products . . . . Its purpose was to safeguard the consumers by applying the Act to articles from the moment of their introduction into interstate commerce all the way to the moment of their delivery to the ultimate consumer." Whitehall argues that this federal enactment is a complete regulatory scheme leaving no room for state action, particularly since,

as it argues, the state statute is directly in conflict with the federal statute.

In determining whether the "Dangerous Drug Act of 1955" and the regulation promulgated thereunder have been suspended by the "Federal Food, Drug and Cosmetic Act" resort must be had to the language of the federal legislation for the purpose of ascertaining, if possible, the intent of Congress. An examination of the federal statute reveals neither an express nor implicit exposition of any Congressional intent to preclude state action in the field of regulation of the sale and dispensing of drugs: there is, within the statute, "no scheme of federal regulation" so "pervasive" as to lead to the inference that the federal government by the passage of this legislation intended to pre-empt the field. The mere fact that Congress has taken action in this field does not justify the assumption that the federal system was thus intended to dominate that field.

Nor does the policy of this Commonwealth as enunciated in the "Dangerous Drug Act of 1955" and the regulation adopted thereunder produce a result inconsistent with the purposes and objectives of the "Federal Food, Drug and Cosmetic Act". A comparison of both statutes indicates a common recognition on the part of both the federal and the state governments that the inclusion of phenobarbital as an active ingredient in the drug "Primatene" requires that the users thereof be warned, by an appropriate label on the drug itself, that the use of the drug may become habit forming; to the extent that this labelled caution is efficacious in discouraging the regular and continued use of the drug the health of the public is thereby protected. The state statute and the regulation adopted thereunder proceed a step further than the federal statute; they set forth a policy of this Common-

wealth, arrived at after investigation, study and consultation with qualified authorities, that any drug which contains phenobarbital as an active ingredient and, thus, under federal legislation requires a cautionary label that it may be habit forming, cannot be sold or dispensed in this Commonwealth without the issuance of a prescription issued by a duly qualified person. Under the policy set forth by the Commonwealth not only is the user of the drug warned of the potentiality of the drug as to habit forming but the user cannot purchase such drug until the propriety of the use of the drug by such individual has been approved by a person duly qualified to judge such propriety and evidenced by the issuance of his prescription.

The primary design of the federal statute is "to prevent the misuse of the facilities of interstate commerce in conveying to and placing before the consumer misbranded and adulterated articles of medicine . . ., and in order that its protection may be afforded to those who are intended to receive its benefits the brands regulated must be upon the packages intended to reach the purchaser": *McDermott v. State of Wisconsin*, 228 U. S. 115, 131 (interpreting the Federal Food and Drugs Act of 1906). The primary thrust of the state statute is not upon the manner in which the drug is labelled or branded for in that respect it follows expressly the federal legislation, but upon the manner in which the drug is sold or dispensed. In this connection the language of the court below is apt: "The Federal law does not require sale of the drug without prescription, but only permits it. The State, then, may in appropriate circumstances as a police measure require sale by prescription, in which event the prescription label would be carried. This State regulation does not interfere with the broad purpose of Congress in the Federal Food, Drug and Cosmetic Act to prevent adulteration and misbranding of drugs".

Whitehall argues that, if the state regulation is valid, a "misbranding" under the federal legislation results and a conflict takes place between the two jurisdictions. A complete answer to this contention was made in the court below which, after pointing out that Whitehall overlooked the application of Section 503 of the "Federal Food, Drug and Cosmetic Act", supra, 21 U.S.C.A. (pkt. pt.) 353(b)(1) (c)(2) stated that Section 503 . . . "provides that any drug dispensed by filling or refilling a written or oral prescription of a duly licensed practitioner shall be exempt from the requirements of 21 U.S.C.A. Pkt. Parts 352 (d), supra (relating, inter alia, to barbituric acid) 'if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in such prescription'. This paragraph . . . shows, inter alia, an intent upon the part of the Congress to permit a prescription label on certain drugs . . . (barbituric acid) when a druggist sells those drugs upon prescription with directions and cautionary statements. It seems to us that this section (Section 503) . . . shows clearly that if 'Primatene' were sold on prescription, it would not be in any way defacing a Federal label. It would only be necessary in that event for the drug to bear a label meeting the requirements of this last named section of the Federal Act".

The federal and state statutes, together with the regulation presently attacked, are not in conflict; their coexistence will defeat none of the purposes and objectives of either statute. In the health and welfare of its citizens the Commonwealth has a vital interest; a necessary concomitant of such interest is the pro-

tection of its citizens from drugs containing active ingredients the use of which, without proper supervision, may be harmful and even dangerous. It is not only the right but the duty of the Commonwealth to surround the use of such drugs with such safeguards that they may be used, if at all, safely and properly. When the Commonwealth, in the exercise of such duty, does act, its actions should not be held to be suspended or superseded by federal action *unless the Congress has clearly and unmistakably revealed its intent to pre-empt the field and to render dominant the federal control.* In the Federal Food, Drug and Cosmetic Act the Congress, neither by expression nor implication, has indicated any such intent; in the absence of the revelation of any such intent the state statute and the regulation promulgated thereunder should not be held to be suspended or superseded. Until such time as the Congress clearly and unmistakably evidences an intent to pre-empt the field of regulation of the sale of such drugs, each state has the right and the duty as a police measure to take such action, not inconsistent with federal legislation in that field, for the protection of the health and safety of its citizens.

Whitehall's next contention—that the Secretary of Health lacked authority under the statute to promulgate this regulation—is likewise without merit. Whitehall complains because the Secretary of Health chose to regulate the sale of "Primatene" by a regulation issued under Section 2(1)(b), rather than under Section 2(1)(a), of "The Dangerous Drug Act of 1955", supra. It contends that had the Secretary acted under Section 2(1)(a) he would have been obliged under that Section and Section 3 to have advanced "cogent reasons" for nonconformance with the federal legislation; since the Secretary, however, elected to act under Section 2(1)(b)—i.e., the Secretary found that "Pri-

matene" was a "dangerous drug" because of its "potentiality for harmful effect" and dispensable only upon prescription—he lacked the authority to issue any regulation inasmuch as that Section contains no provision for the issuance of a regulation thereunder. Such a contention completely ignores the authority granted under Section 7(b) of the Act, supra, which empowers the Secretary to make such rules and regulations as are necessary for the enforcement of the Act. Section 3—dealing with conformity with the federal legislation and the necessity for "cogent reasons" for deviating from the federal legislation—applies only to drugs classified as "dangerous" under Section 2(1)(a) and does not apply to drugs classified as "dangerous" under Section 2(1)(b). Subscription to this theory of Whitehall would result in an anomaly; the legislature would be held to have intended that the Secretary have the authority to classify drugs as "dangerous" under Section 2(1)(b) and yet have no authority to make any rule or regulation concerning the use or dispensing of such drugs. Such a construction is unreasonable, completely ignores the language of Section 7 of the Act and defeats the clear legislative purpose in its passage of the statute. The action of the Secretary in the promulgation of this regulation was well within the authority granted him by the statute.

The third contention of Whitehall is that the evidence taken in the court below fails to support the court's finding that "Primatene" is a "dangerous" drug under the statute. In passing upon this contention we are mindful that: "It is, by now, hornbook law that *findings of fact* by a chancellor who saw and heard the witnesses, especially when approved by the court en banc, *will not be reversed by an appellate court if there is adequate evidence to sustain them*":

*McRoberts v. Phelps,* 391 Pa. 591, 598, 138 A. 2d 439, quoting from *Barrett v. Heiner,* 367 Pa. 510, 515, 80 A. 2d 729; *Willwerth v. Dunlap,* 391 Pa. 12, 13, 137 A. 2d 269.

We have examined the evidence in the court below and are convinced that the court's findings of fact in this respect is adequately supported. In addition to the fact that phenobarbital was shown to possess a tendency to be habit forming, the drug "Primatene" was shown to contain in full dosage the active ingredient of ephedrine hydrochloride. There was testimony that ephedrine hydrochloride possesses certain potentialities for harm from its use: (1) it tends to increase blood pressure; (2) it tends to increase and stimulate the work of the heart; (3) it increases automation and an abnormal heart beat; (4) it affects the central nervous system and may cause irritability, nervousness and an increase in the response of an individual to outward stimuli; (5) it dilates the bronchial tubes. There was other evidence which indicated that the presence in the drug of ephedrine hydrochloride combined with phenobarbital might create a hazard for users of the drug if afflicted with cardiac, renal or liver conditions. The purpose behind the inclusion of phenobarbital in the drug was to counteract the stimulating effect of the ephedrine hydrochloride; under some of the testimony it was pointed out that the times when phenobarbital and ephedrine hydrochloride take effect are variable so that the effects of the former might take place when the effects of the latter had passed their height and were subsiding. Highly qualified, experienced and reputable physicians and pharmacologists testified that the use of "Primatene" might be hazardous for persons suffering from cardiac, renal or liver conditions, while other qualified, experienced and reputable physicians and pharmacologists

testified to the contrary. The chancellor saw and heard all these witnesses and he chose to rely on those witnesses who testified that the use of the drug could be hazardous; for his judgment we do not substitute our own. The findings of the chancellor, approved by the court en banc, are founded upon evidence adequate and sufficient, both quantitatively and qualitatively.

Decree affirmed.

Mr. Justice COHEN and Mr. Justice McBRIDE took no part in the consideration or decision of this case.