Harris-Walsh, Inc. *v.* Dickson City Borough, Appellant.

Argued October 1, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*John E. V. Pieski,* for appellant.

*Morey M. Myers,* with him *Gelb, Carey & Myers,* for appellee.

*William J. Oliver,* with him *Oliver, Price and Rhodes,* for appellees.

OPINION BY MR. JUSTICE JONES, January 17, 1966:

This appeal involves a challenge, successful in the court below, to the validity of a borough ordinance which seeks to regulate, within the territorial limits of the borough, the future mining of anthracite coal by the strip mine method.

Since 1950, Harris-Walsh, Inc. (Harris-Walsh), has been engaged in the removal of anthracite coal[1] by strip mining within the limits of the Borough of Dickson City (Borough), Lackawanna County. On June 28, 1963, the Borough adopted an ordinance, later amended on December 17, 1963, regulating future strip mining operations within the Borough limits. In accordance with the provisions of §5 of this ordinance, the Borough, by resolution on February 10, 1964, required that Harris-Walsh furnish a bond in the amount of $80,666 on or before February 17, 1964.[2]

On February 18, 1964, Harris-Walsh, averring that the ordinance was "illegal, unlawful and unconstitutional" for seventeen stated reasons and that it had been advised that, if the required bond was not posted,

---

[1] This coal is owned by Parmoff Corporation and Moffat Coal Company, Inc., which had a contract of mine-lease with Parmoff to strip mine the coal. Harris-Walsh is strip mining the coal under agreement with both Parmoff and Moffat. By court order, Parmoff and Moffat were permitted to be joined as parties plaintiff in this litigation.

[2] Section 4 of the ordinance requires that a strip mine operator, within one month after a strip mine operation is abandoned, "backfill all stripping pits, so that the surface of the soil is restored as close as practicable to its natural condition as it existed prior to such mining." In implementation of §4, §5 requires the strip mine operator, as a prerequisite to commencing to strip mine, to furnish a bond conditioned on compliance with §4 and the amount of the bond is to be "based upon the estimate of the reasonable cost of such backfilling."

the Borough would invoke the ordinance-provided crim-- inal penalties, instituted an equity action in the Court of Common Pleas of Lackawanna County against the Borough and requested a preliminary injunction. The court preliminarily restrained the Borough from enforcing the ordinance against Harris-Walsh. Thereafter, various hearings were held and, on October 5; 1964, the court entered a decree nisi which held the ordinance invalid and permanently enjoined the Borough from its enforcement. Thereafter, the Commonwealth of Pennsylvania was permitted to intervene.[3] On March 10, 1965, the court dismissed exceptions to its decree nisi and entered a final decree from which the Borough now appeals.

Initially, we must consider whether the court below, sitting as a court of equity, had *jurisdiction* to entertain this action to restrain the enforcement of this ordinance. Although none of the parties to this action question equity's jurisdiction—in fact, the parties agree equity has jurisdiction—nevertheless, it is our duty to inquire into the existence of jurisdiction. We have recently said: "Jurisdiction can be raised at any time, even at the appellate level and *by the appellate court itself*: [citing authorities]": (Emphasis supplied) *Balazick v. Dunkard-Bobtown Municipal Authority,* 414 Pa. 182, 185, 199 A. 2d 430.

If at law there exists a remedy, complete and adequate in nature, equity will not assume jurisdiction; absent such a remedy, equity may act. A remedy at law may be provided under the statute or the ordinance the validity of which is attacked, but, unless such statute or ordinance provides a remedy *adequate* "to the task of resolving plaintiffs' objections," the mere existence of such remedy will not preclude the assumption

---

[3] The Commonwealth in the court below took the position the ordinance was valid.

of equitable jurisdiction: *Bliss Excavating Co. v. Luzerne County,* 418 Pa. 446, 451, 211 A. 2d 532.

In the case at bar, does an adequate remedy at law exist? The only section of this ordinance which might be construed as remedy-providing is §8 which provides criminal penalties[4] for violation of the ordinance but such remedy, which would require subjection to a criminal prosecution, is not of such adequacy as to oust equity of jurisdiction.[5] No other remedy would be available to *adequately* meet this challenge to the validity of the ordinance.[6]

By way of contrast, recently in *Bliss Excavating Co. v. Luzerne County,* 418 Pa. 446, supra, a group of strip mine operators instituted an action in equity which challenged the validity of a county zoning ordinance which, inter alia, purported to regulate strip mining within the territorial limits of the county. In *Bliss,* both the zoning ordinance and the enabling statute provided administrative and judicial procedures sufficient to *adequately* determine all possible questions raised by the strip mine operators; we, therefore, held equity lacked jurisdiction to entertain that action. Unlike *Bliss,* the instant ordinance provides no such adequate remedy; therefore, equity does have jurisdiction[7] to entertain this action.

---

[4] A fine of not more than $100 and, in default of the payment thereof, not more than 30 days imprisonment: each day's violation constitutes a separate offense.

[5] Cf. *Boggs v. Werner,* 372 Pa. 312, 94 A. 2d 50; *Palmer v. O'Hara,* 359 Pa. 213, 58 A. 2d 574; *Commonwealth v. Soboleski,* 303 Pa. 53, 153 A. 898.

[6] The Borough Code (Act of May 4, 1927, P. L. 519, §1010, as amended, 53 P.S. §46010), which provides for appeals questioning the legality of an ordinance, affords no adequate relief. Cf. *Wood v. Goldvarg,* 365 Pa. 92, 95, 74 A. 2d 100.

[7] Jurisdiction in the dual sense, that is. neither an adequate remedy at law nor an existing statutory procedure.

Two questions the Borough presents on this appeal: (1) has the Commonwealth of Pennsylvania preempted the field of regulation of strip mining of anthracite coal so as to prohibit the enactment by the Borough of this strip mine ordinance? (2) did the chancellor err in excluding evidence as to relative conditions relating to the backfill of stripping pits within and without the Borough?

Although the mining of anthracite coal by the strip mine method has been in progress for many years, it was not until 1947 that the legislature took steps to protect the public's interests by a regulation of such industry. In the meantime the strip mining of anthracite coal had created in the anthracite coal field in Northeastern Pennsylvania an intolerable situation. In disregard of the interests of the public, the strip mine operators scarred and defaced the region, removed the overburden from the coal and piled it in huge and unsightly refuse banks which constituted potential fire hazards, created holes, open pits and huge craters in the terrain which were left unfilled and in such condition as to constitute potentially dangerous traps for unwary children and adults, converted vast areas of scenic beauty into unsightly and ugly surroundings and even conducted their mining operations in close proximity to the yards and homes of the public: in short, these operators created a situation which adversely affected the properties, the safety and the general welfare of the public in the area. The complete indifference of government on the state level to the creation and existence of this intolerable situation up until 1947 is beyond understanding; even now, the condition remains but slightly alleviated.

Prior to 1947, the only legislative step taken in connection with strip mining was the passage of a statute in 1941; the purpose of that statute was to protect "the health and safety of persons employed" in stripping

operations in both the anthracite and bituminous coal fields; this statute did not, nor did it purport to, regulate the operation of the industry.[8] On June 27, 1947, the "Anthracite Strip Mining Law" was passed (Act of June 27, 1947, P. L. 1095, §1 et seq., 52 P.S. §681.1 et seq.). Its stated purpose was as "an exercise of the police power to provide for the improvement and conservation of lands affected by the mining of anthracite coal by the open pit or strip mining method; to prevent the combustion of such coal and the pollution of rivers and streams and improve the use and enjoyment of such lands; to preserve the value of such lands for taxation, to decrease and prevent soil erosion and aid in the protection of game and wild life; and generally to provide for the public safety, health and general welfare." (Act of 1947, supra, §1, 52 P.S. §681.1).[9]

---

[8] The Act of June 18, 1941, P. L. 133, §1 et seq., 52 P.S. §1471 et seq. was amended by the Act of September 23, 1959, P. L. 958, §1, 52 P.S. §1472. The 1959 statute amended the 1941 statute in two respects: (a) it made the 1941 Statute's provisions applicable to *every* strip mine operation in the Commonwealth; (b) it increased the penalties for violation of the statute. The 1941 statute was *specifically* saved from repeal when the legislature in 1947 took the first step toward regulation of the industry with the passage of the "Anthracite Strip Mining Law", supra (52 P.S. §681.22) and no later legislation has, either expressly or impliedly, repealed the 1941 statute, as amended. In this connection, it might be noted that the Borough, in interpreting §10 of the "Anthracite Strip Mining and Conservation Act of 1963", supra, argues that, when the 1941 statute was amended by the 1959 statute, the 1941 statute became a *new* statute and, therefore, the legislature in 1963, to eliminate the possibility that the 1941 and 1959 statutes might be considered as repealed by the 1963 statute, inserted §10 in the 1963 statute. Such argument is utterly without merit. Both the 1941 and 1959 statutes, which provide for the health and the safety of workers in the strip mine industry, remain in full force and effect and would have so remained in effect without the language of §10 of the 1963 statute.

[9] Between 1947 and 1963, the 1947 statute was amended by the Acts of May 18, 1949, P. L. 1471, §1, 52 P.S. §§681.6, 681.8, 681.9;

The 1947 statute included provisions providing for the issuance of permits to, and the filing of bonds by, strip mine operators, blasting, back-filling, fire prevention, drainage, replanting of stripped areas and the locations of operations in relation to highways, homes and public buildings and was applicable to *all* strip mining operations in the *anthracite* coal field.

On August 13, 1963, the legislature extensively revised and amended the 1947 statute and amendments thereto by a statute entitled the "Anthracite Strip Mining and Conservation Act" (Act of August 13, 1963, P. L. 781, §1 et seq., 52 P.S. §681.1 et seq.). The stated purpose of this statute was "the regulation of mining of anthracite coal by the open pit or strip mining method and for the conservation and improvement of lands affected directly or indirectly by such mining; requiring operators to be licensed, to pay license fees, to secure permits to engage in strip mining and to file bonds conditioned for compliance with this act; requiring backfilling of stripping pits and leveling and planting lands affected to prevent erosion and the pollution of waters and to protect public health, safety and welfare; conferring powers and imposing duties upon the Department of Mines and Mineral Industries; providing for appeals, and imposing penalties, and making appropriations."

The thrust of the Borough's contention is that, even though it has enacted legislation dealing with the regu-

---

of August 24, 1951, P. L. 1364, §1, 52 P.S. §681.11; of July 2, 1953, P. L. 338, §§1, 2, 3, 4, 52 P.S. §§681.12, 681.14, 681.16, 681.19; of August 19, 1953, P. L. 1112, §1, 52 P.S. §§681.14, 681.16, 681.19; of April 4, 1956, P. L. (1955) 1398, §§1, 2, 9, 52 P.S. §§681.3, 681.4, 681.5, 681.11, 681.15; of September 2, 1961, P. L. 1194, §§2-13, inc., 52 P.S. §§681.3, 681.5, 681.6, 681.7, 681.8, 681.9, 681.11, 681.15, 681.16, 681.17, 681.18, 681.19, 681.20. As to the basic issue on this appeal, the particular provisions of these amendments are unnecessary to be noted.

lation of anthracite coal strip mining, the Commonwealth has not preempted the field to the exclusion of legislative action in such field by political subdivisions, such as the Borough. The court below held that the Commonwealth has preempted the field. The validity of that ruling must now be determined.

In a landmark case, *Western Pennsylvania Restaurant Association v. Pittsburgh,* 366 Pa. 374, 380, 381, 77 A. 2d 616, this Court, speaking through Mr. Justice (later Chief Justice) STERN, enunciated the appropriate criteria for determining whether the Commonwealth, to the exclusion of its political subdivisions, has preempted by legislation the regulation of certain activities: "(1) There are statutes which expressly provide that nothing contained therein should be construed as prohibiting municipalities from adopting appropriate ordinances, not inconsistent with the provisions of the act or the rules and regulations adopted thereunder, as might be deemed necessary to promote the purpose of the legislation. On the other hand there are statutes which expressly provide that municipal legislation in regard to the subject covered by the State act is forbidden. Then there is a third class of statutes which, regulating some industry or occupation, are silent as to whether municipalities are or are not permitted to enact supplementary legislation or to impinge in any manner upon the field entered upon by the State; in such cases the question whether municipal action is permissible must be determined by an analysis of the provisions of the act itself in order to ascertain the probable intention of the legislature in that regard. It is of course self-evident that a municipal ordinance cannot be sustained to the extent that it is contradictory to, or inconsistent with, a state statute: [citing an authority]. . . . municipalities in the exercise of the police power may regulate certain occupations by imposing restrictions which are in addition to, and not

in conflict with, statutory regulations: [citing authorities]. But if the general tenor of the statute indicates an intention on the part of the legislature that it should not be supplemented by municipal bodies, that intention must be given effect and the attempted local legislation held invalid: [citing authorities]."[10] In *Department of Licenses v. Weber,* 394 Pa. 466, 468, 469, 147 A. 2d 326, Mr. Justice MUSMANNO, speaking for this Court said: "Of course, it is obvious that where a statute specifically declares it has planted the flag of preemption in a field, all ordinances on the subject die away as if they did not exist. It is also apparent that, even if the statute is silent on supersession, but proclaims a course of regulation and control which brooks no municipal intervention, all ordinances touching the topic of exclusive control fade away into the limbo of 'innocuous desuetude'. However, where the Act is silent as to monopolistic domination and a municipal ordinance provides for a localized procedure which furthers the salutary scope of the Act, the ordinance is welcomed as an ally, bringing reinforcements into the field of attainment of the statute's objectives." Through an examination of the state's legislation on the subject, we must seek to determine, if possible, whether the legislature has manifested an intention to preempt the field of regulation of the anthracite strip mining industry.

Section 10 of the "Anthracite Strip Mining and Conservation Act" (Act of 1963, supra, §10, 52 P.S. §681.20c) provides: "Except as herein provided,[11] *all* coal stripping operations coming within the provisions

---

[10] As to preemption by the Congress of the United States to the exclusion of state legislation in a field; see, *Commonwealth v. Nelson,* 377 Pa. 58, 104 A. 2d 133; *Whitehall Laboratories v. Wilbar,* 397 Pa. 223, 154 A. 2d 596.

[11] This clause is of no importance on the issue raised on this appeal.

of this act shall be under the *exclusive jurisdiction* of the department [Department of Mines and Mineral Industries of the Commonwealth] and shall be conducted in compliance with such reasonable rules and regulations as may be deemed necessary by the secretary [Secretary of Mines and Mineral Industries of the Commonwealth] for the health and safety of those persons engaged in the work. The secretary through the mine inspectors shall have the authority and power to enforce the provisions of this act and the rules and regulations promulgated thereunder by him." (Emphasis supplied). The clear implication of this language in the statute is *exclusive jurisdiction* is vested in the Department over the totality of all coal stripping operations which fall within the statute, i.e., every "stripping pit located within the boundaries of a mine inspection district" (Act of 1963, supra, §3, 52 P.S. §681.3) in which anthracite coal is mined or recovered "by removing the material which overlies the coal bed in its natural or previously mined condition" (Act of 1963, supra, §3, 52 P.S. §681.3).

What does the phrase "exclusive jurisdiction" commonly and ordinarily connote or mean? Almost a half-century ago, the Superior Court in *Commonwealth v. Supt. House of Correction*, 64 Pa. Superior Ct. 613, 623, interpreting "exclusive jurisdiction" as used in a statute, said: "Nor can there be any doubt as to the meaning the legislature intended to give to the word exclusive. In its usual and generally accepted sense, as given by lexicographers, and in the ordinary speech of the people, it means,—possessed to the exclusion of others; appertaining to the subject alone, individual, sole; to confer exclusive jurisdiction on one court deprives all other courts of such jurisdiction, whether therefore exclusive or concurrent, conferred by statute. 3, Words and Phrases, 2550; possessed and enjoyed to the exclusion of others; debarred from participation and enjoy-

ment to any other; nor including, admitting or pertaining to any other; opposed to inclusive: 17 Cyc. 871-2." See also: The Oxford English Dictionary, (1933), Vol. III, p. 384. The word "exclusive" is of Latin derivation—"ex" meaning "out" and "claudere" meaning "to shut". "Exclusive" precludes any idea of co-existence and its usual, ordinary and generally accepted meaning is "sole", "undivided" and "possessed to the exclusion of others".

Both by statute and decisional law we are required to construe words and phrases according to their common and approved usage; statutes are presumed to employ words in their popular and plain everyday sense and the popular meaning of such words must prevail unless the statute defines them otherwise or unless the context of the statute requires another meaning: Act of May 28, 1937, P. L. 1019, §33, 46 P.S. §533; *Commonwealth v. McHugh,* 406 Pa. 566, 569, 178 A. 2d 556; *Jury Estate,* 381 Pa. 169, 176, 177, 112 A. 2d 634.

It is clear that the legislature has not *specifically* defined the phrase "exclusive jurisdiction" in the statute. Therefore, as it must, the Borough relies upon the provisions and context of the statute as mandating the assignment to the phrase "exclusive jurisdiction" a meaning other than its usual and ordinary meaning. The Borough contends that, when the legislature employed the phrase "exclusive jurisdiction" in §10 of the statute, an examination of the statute reveals that it intended to grant an undivided and exclusive jurisdiction (a) *only* in respect to the rules and regulations which affect the health and the safety of workers in the industry or (b) *only* to *administer* the provisions of the 1963 statute.

The Borough would limit the exclusive jurisdiction of the state to the area of the safety of the workers in the industry by reason of what might be termed a grammatical argument. The important sentence in §10 con-

sists of two clauses: "all coal stripping operations coming within the provisions of this act shall be under the exclusive jurisdiction of the department" AND "shall be conducted in compliance with such reasonable rules and regulations as may be deemed necessary by the secretary for the health and safety of those persons engaged in the work". Relying on its supposition that the 1941 and 1959 statutes, supra, which deal with the safety of the workers in the industry might be considered to have been repealed, impliedly, by the 1963 statute; the Borough contends that the legislature wanted to remove any doubt that might arise as to the continued vitality of the 1941 and 1959 statutes and for that reason inserted into §10 of the 1963 statute the language in the second clause of the sentence. Such is the background of the Borough's argument based on the word "and" connecting the two clauses. With that background in mind, the Borough then argues that the second clause modifies the first clause of the sentence and that such modification requires the conclusion that exclusive jurisdiction to the department and the secretary extended only in respect to the formulation and enforcement of rules aimed at the protection of the health and safety of workers in the industry which is the subject of the second clause. Of course, if that argument is sound, then there is no express preemption of the field of anthracite strip mining by the Commonwealth to the exclusion of legislative action by its political subdivisions.

Neither the 1963 statute nor any prior statutes which it amends, either by title or by provisions, purports to provide measures for the protection of the workers in the industry; the whole thrust of the 1963 statute and its predecessors is the protection of the public. A reading of the provisions of these statutes makes clear beyond any question the purpose of these statutes. Viewed in such light, it would be absurd to

attribute to the legislature's employment of the phrase "exclusive jurisdiction" an intention to confine such exclusive jurisdiction to a field not covered by the provisions of the statute. We cannot interpret the grant of "exclusive jurisdiction" in so limited and restricted manner; to do so would render absurd the legislative intention.

The Borough next contends that the phrase "exclusive jurisdiction" must be confined to the *administration* of the provisions of the statute and, since the Borough does not by its ordinance intend to *administer* the provisions of the state statute, the field in which the Borough intends to act has not been preempted. In this connection another provision of the 1963 statute must be noted. Section 10 provides, inter alia, for the creation within the Department of Mines and Mineral Industries of the Commonwealth of a new Bureau to be known as the "Bureau of Anthracite Conservation and Reclamation". To this Bureau, §10 *expressly* commits the "power" and "duty" to *"administer* all of the laws of this Commonwealth governing and relating to the mining of anthracite coal by the open pit or strip method and, subject to the approval of the secretary, to exercise all the powers and perform all the duties by law vested in and imposed upon said secretary in relation to such open pit or strip mining". (Emphasis supplied). Act of 1963, supra, §10, 52 P.S. §681.20b. Having spelled out *by whom* the provisions of the 1963 statute, as well as all other statutes dealing with anthracite strip mining, are to be *administered* the legislature would indeed be guilty of redundancy if it intended that the grant of exclusive jurisdiction contained in another sentence of the same section be restricted merely to the *administration* of the provisions of the statute. When the legislature wanted to make clear *by whom* the statute was to be *administered* it did so and no further grant of power to administer the statute was necessary.

Neither argument of the Borough has merit. The words "exclusive jurisdiction" must be given their ordinary, plain and everyday meaning; there exists no reason to assign any other meaning. Giving these words their plain meaning it is clear beyond question that the legislature, by the employment of such words, intended that the Commonwealth, and only the Commonwealth, shall regulate the anthracite strip mining industry. These words, clear and plain in meaning, preclude legislative action in the same field by any political subdivision such as the Borough. The Commonwealth in §10 of the statute has expressly preempted the field to the exclusion of the Borough and, in so ruling, the court below was correct.

In view of the conclusion reached, we need not seek whether the statute *by implication* has preempted the field nor whether the statute and the ordinance so conflict that the latter must fall. Moreover, we need not inquire into the validity of the rejection by the court below of the evidence as to backfill conditions within and without the Borough, the second question raised on this appeal.

It may not be inappropriate to note that the reason why the Borough passed this ordinance was its belief that the Commonwealth has not acted adequately in attempting to regulate this industry and that the legislation enacted was simply a "half measure", weak and supine. The belief of the Borough may be well founded. However, the adequacy of the legislation to cope with the problem and the wisdom or the lack thereof on the part of the legislature in framing this legislation is not for us to determine. Such questions are solely for the legislature to determine and upon their province we must not encroach.

Decree affirmed. Each party to pay own costs.

Mr. Chief Justice BELL and Mr. Justice ROBERTS concur in the result.

CONCURRING OPINION BY MR. JUSTICE COHEN:

I concur in and join in the opinion of the majority because there is no indication in the opinion that a properly enacted zoning ordinance which would prohibit strip mining in a zoned area would not be effective. A properly enacted zoning ordinance is not preempted by the Act.