Commonwealth of Pennsylvania, Industrial Board
*v.* United States Steel Corporation, Appellant.

Argued October 29, 1975, before President Judge
BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKIN-
SON, JR., MENCER, ROGERS and BLATT.

*A. Sieber Hollinger,* with him *Reed, Smith, Shaw & McClay,* for appellant.

*Herbert S. Cohen,* Assistant Attorney General, with him *Charles S. Solit,* General Counsel, for appellee.

OPINION BY JUDGE MENCER, January 12, 1976:

United States Steel Corporation (U. S. Steel), appeals to this Court from an adjudication of the Industrial Board (Board) commanding U. S. Steel to comply with that portion of an order of the Bureau of Occupational and Industrial Safety of the Department of Labor and Industry (Department) requiring submission of U. S. Steel's plans for the construction of six surface structures at its Dilworth Mine.

Our scope of review in this appeal is prescribed by Section 44 of the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, *as amended,* 71 P.S. §1710.44; therefore, the adjudication of the Board must be affirmed unless it is not in accordance with the law or unless it constitutes an arbitrary, capricious, or unreasonable determination due to the absence of substantial evidence to support its findings.

Initially, we note that we have carefully scrutinized the record below, and we find that it more than adequately supports the factual findings of the Board. Of course, our review does not stop here, as we are additionally required to examine the adjudication for such errors of law as may have been committed by the Board. It is this aspect of our review that brings into focus the substance of this appeal.

The history of this case began in 1972 when U. S. Steel commenced the construction of its new Dilworth

bituminous coal mine at Rices Landing, Pennsylvania. In addition to the mine structures, machinery, and equipment installed beneath the surface of the earth, U. S. Steel also began erecting above the ground at the site of the mine various structures and items of machinery and equipment necessary to support the overall mining operation.

On July 8, 1974, the Department issued its compliance order, alleging U. S. Steel's violation of Section 8 of the Fire and Panic Act, Act of April 27, 1927, P. L. 465, *as amended,* 35 P.S. §1228. This section, when applied to U. S. Steel, allegedly would require that company to submit its construction plans for 16 surface structures to the Department for approval prior to construction. Also, U. S. Steel would be required to obtain a subsequent Certificate of Occupancy from the Department after the final inspection of the structures.

On August 28, 1974, U. S. Steel perfected an appeal with the Board, which held its first hearing on October 22, 1974. Prior to a second hearing on November 27, 1974, the Department rescinded its original compliance order with respect to 10 of the 16 structures at issue. Therefore, at the second hearing only the status of the remaining six structures—namely, (1) the oil storage building, (2) the carpenter shop, (3) the cleaning shed, (4) the hoist house, (5) the substation building, and (6) the water treatment plant—was considered. On March 26, 1975, the Board issued its adjudication which required U. S. Steel to submit its plans for these remaining six structures. This appeal followed.

U. S. Steel initially contends that the Department lacks jurisdiction to regulate *any* surface mine structures at any bituminous coal mine site. This contention is founded on the proposition that the Pennsylvania Bituminous Coal Mine Act, Act of July 17, 1961, P. L. 659, *as amended,* 52 P.S. §701-101 et seq., and other relevant mining acts *confer absolute exclusive jurisdiction* upon

the Pennsylvania Department of Mines and Mineral Industries (since 1970, the Department of Environmental Resources (DER)) in the regulation, supervision, and inspection of all bituminous coal mines *and their nearby environs*. With this proposition we cannot agree.[1]

We have carefully reviewed the Pennsylvania Bituminous Coal Mine Act in search of a legislative direction indicating that its application, to other than direct mining functions, is to be exclusive. We have found none. While in fact the Act in certain aspects does set forth requirements for a limited number of surface structures, we have discovered no broad comprehensive requirements mandating *exclusive* coverage of the Act to all surface structures, no matter how used in mining operations.[2] It is only in the area of miner safety in the performing of mining functions (especially subsurface functions) that the Act expresses its *exclusivity*. In all other areas the Act's *control* is limited to situations where its coverage extends by direct application.

The fact is that all surface structures or parts thereof, which are to some degree controlled by the Act, bear some direct relationship to the health and safety of mine workers performing mining functions. The Act's obvious intent is to regulate the ongoing functions of a mining enterprise with particular emphasis on in-mine safety, not to regulate all of the construction plans of structures fre-

---

1. We pause here to note that the Department does not in any manner contend that it has any power to control or regulate subsurface mining functions. In the subsequent discussion, we have therefore limited our analyses to the application of the respective laws to the surface structures at issue only. This exclusivity of DER's jurisdiction for subsurface functions is not questioned.

2. The specific repealers in the Act (Section 705, 52 P.S. §701-705) deal only with earlier *coal mining* legislation. The general repealer (Section 706, 52 P.S. §701-706) is broad and indefinite. From these sections and from the Act's title we cannot discern a legislative intent of total statutory exclusivity.

quented by surface personnel.[3] This is not to say that some provisions of the Act do not conflict with, or are not duplicative of, other provisions of statutes of general applicability in the Commonwealth. What we conclude is that the Act does not so broadly encompass all aspects of bituminous coal mining as to preclude the application of the general statutes of the Commonwealth. *See* Statutory Construction Act of 1972, 1 Pa. C.S. §1971.

U. S. Steel cites *Harris-Walsh, Inc. v. Dickson City Borough,* 420 Pa. 259, 216 A. 2d 329 (1966), as controlling this issue. With this we cannot agree. *Harris-Walsh* concerned the provisions of a borough ordinance regulating the operations of anthracite coal strip mining within the borough's boundaries. Our Supreme Court found this ordinance to be in direct conflict with the Anthracite Strip Mining and Conservation Act, Act of June 27, 1947, P. L. 1095, *as amended,* 52 P.S. §681.1 et seq. After reviewing the legislative history of the Anthracite Strip Mining and Conservation Act and after discussing at some length the exclusivity of that Act, our Supreme Court held that the Act had totally *preempted* legislative action in the same field *by any political subdivision such as a borough.*

In the instant case we are not, as in *Harris-Walsh,* confronted with a statutory *preemption* conflict between a borough ordinance and a state statute. Instead, there exists here merely an alleged conflict between two state

---

3. We have also examined the rather extensive compilation of statutes accumulated in Vol. 52 of Purdon's Pennsylvania Statutes Annotated, and we can find no direct support for a supposition that this accumulation of mining laws, taken as a whole, was intended to supersede all of the general laws of the Commonwealth. Though the mining laws of this Commonwealth are necessarily rather extensive, they do not reach to that level of exclusivity and uniformity that would foreclose any further regulation, through the use of other legislation, or any onsite mining functions. *See* Statutory Construction Act of 1972, 1 Pa. C.S. §1971.

statutes or between two general bodies of state law. This is quite a different matter.[4] In *Harris-Walsh,* the borough ordinance included a provision, which the defendants were charged with violating, requiring the defendants to post bond guaranteeing the subsequent reclamation of stripped properties, an area of law specifically covered by the Commonwealth's statute. *Harris-Walsh* therefore involved a matter of *preemption between the directly conflicting legislation of two governmental bodies,* one of which (the municipality) is necessarily constitutionally inferior to the other (the Commonwealth). *See Western Pennsylvania Restaurant Association, supra* note 4. In the instant case, the source of authority is the same; *i.e.,* the Commonwealth acting through its General Assembly.[5]

Finally, we note that in *Harris-Walsh* the Supreme Court only held that the Anthracite Strip Mining and Conservation Act preempted municipal direct regulation of anthracite mining functions; it did not preclude the application of all laws or even all ordinances in the Com-

---

4. The two concepts are not comparable. For analyses of the law concerning Commonwealth preemption in cases of encroaching municipal legislation, see *Western Pennsylvania Restaurant Association v. Pittsburgh,* 366 Pa. 374, 77 A.2d 616 (1951), and *City of Erie v. Northwestern Pennsylvania Food Council,* 14 Pa. Commonwealth Ct. 355, 322 A.2d 407 (1974). For guidance concerning statutory interpretation in the event of irreconcilable or otherwise conflicting legislation of the General Assembly, see the Statutory Construction Act of 1972, 1 Pa. C.S. §1501 et seq.

5. We note that in *Harris-Walsh* the Supreme Court paid particular attention to the *statutorily mandated* concept of exclusivity of control and jurisdiction, resting in the then Department of Mines and Mineral Industries, Bureau of Anthracite Conservation and Reclamation, in the totality of anthracite mining regulation. That direct statutory statement of exclusivity found in Section 20.3 of the Anthracite Strip Mining and Conservation Act, 52 P.S. §681.20c, has no parallel in the Pennsylvania Bituminous Coal Mine Act.

monwealth.[6] To hold otherwise would result in the absurd conclusion that all of the general laws of the Commonwealth concerning all levels of human conduct and societal interaction do not apply to strip mines or their environs. This is not the law under the Anthracite Strip Mining and Conservation Act, and it also cannot be the law under the Pennsylvania Bituminous Coal Mine Act.

Hence, we return to the two statutes and their respective provisions. Section 8 of the Fire and Panic Act, 35 P.S. §1228, provides in part:

> "It shall be the duty of the owner, architect, or contractor of every building or structure, as described in this act, hereafter erected, adapted, remodeled, or altered, to submit to the Department of Labor and Industry for approval, architectural drawings, specifications, or other data showing compliance with the provisions of this act and the rules and regulations of the said department which may be promulgated for the enforcement of the provisions of this act. No such building or structure shall be erected, adapted, remodeled, or altered, until such plans have been examined and approval given by the Department of Labor and Industry, and a building permit obtained in municipalities where such permit is required by ordinance.
>
> . . . .
>
> "Any such owner, architect, or contractor, whose drawings or specifications have been submitted to and approved by said department as herein provided, may proceed with the erection, adapting, remodeling, or altering of such building or structure without submitting such drawings or specifications to or obtaining the approval of any other department, board, or agency of the State government."

---

6. See, for example, the concurring opinion of Mr. Justice COHEN in *Harris-Walsh, supra.*

Additionally, we note that the Act would normally encompass in its application most surface structures at mining sites.[7] Conceding the Fire and Panic Act's coverage of the structures at issue,[8] we note that we have not found any provision in the Pennsylvania Bituminous Coal Mine Act requiring in any manner procedures similar to those found in the Fire and Panic Act (*i.e.*, presubmission and approval of building plans for occupied structures). At most, the Pennsylvania Bituminous Coal Mine Act requires the ongoing general inspection of already completed buildings for the purpose of eliminating post-construction changes in conditions that might contribute to the detriment of employee safety.

Therefore, we hold that the *procedures* set forth in the Fire and Panic Act relevant to our discussion here do not directly conflict with any provisions of the Pennsylvania Bituminous Coal Mine Act. Consequently, U. S. Steel is required to submit its plans for all surface struc-

---

7. Section 2 of the Act, 35 P. S. §1222, provides in pertinent part:

"The following are the classes of buildings and structures which it is intended that this act shall cover:

"Class I Buildings.—Factories, power plants, mercantile buildings, hotels, office buildings, hospitals, asylums, public and private institutions, convalescent and nursing homes, schools, colleges, school and college auditoriums and gymnasiums when used for public assemblages, airports, airport buildings, airplane hangars, dormitories, warehouses, garages, farm buildings, except those used to store produce prepared for market or sell farm products grown, raised or produced by the owner or tenant of the building, *and all other buildings specified by the department, not enumerated in Classes II, III, IV, and V, wherein persons are employed, housed or assembled,* except those farm buildings excluded herein." (Emphasis added.)

34 Pa. Code §37.3 extends the Act's application to all structures not specifically exempted by the statute.

8. During its appeal to this Court, U. S. Steel has not raised this threshold issue of the Act's coverage of the particular structures involved.

tures covered by the Act to the Department prior to construction.

Of course, after submission of the plans, the Department and U. S. Steel will have to reconcile the conflicting standards set forth in the two statutes and in the respective regulations that are present now or may be promulgated in the future. A resolution of the problems that may arise from this area is not presently before us. We do, however, urge the respective parties to this appeal, and the additional authorities that may subsequently become involved in this problem, to exercise a high degree of reasonableness respecting the views of opposing parties. Both acts considered here have the same laudatory purpose—the protection of the working person in this Commonwealth. We trust that neither act will be subjected to interagency bickering or unnecessary litigation.

ORDER

AND NOW, this 12th day of January, 1976, the March 26, 1975 order of the Industrial Board applicable to the United States Steel Corporation is hereby affirmed.

